C. E. GRAHAM REEVES AND JOAN M. REEVES, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2914–74, 4828–74, 4953–74, 5105–74, 5122–74, 5232–74, 5305–74, 5309–74, 5310–74, 5311–74, 5375–74, 5444–74, 6077–74, 6153–74, 6187–74, 8602–74.
Filed February 6, 1979.

*James S. Eustice, Stephen D. Gardner,* and *Max Folkenflik,* for the petitioners.

*Theodore J. Kletnick, Gerald Backer, David R. Brennan, Hu S. Vandervort, Jr.,* and *Michael J. Cooper,* for the respondent.

[1]Cases of the following petitioners are consolidated herewith: Charles W. Coffen and Francine B. Coffen, docket No. 4828–74; Arden S. Heverly and Sophia S. Heverly, docket No. 4953–74; John Phipps and Rita C. Phipps, docket No. 5105–74; Edgar A. Poe, Jr., and Katherine R. Poe, docket No. 5122–74; Eldon S. Chapman and Frances T. Chapman, docket No. 5232–74; Littleton D. Page and Joyce E. Page, docket No. 5305–74; Alexander D. Harry and Melinda Harry, docket No. 5309–74; George E. Ladd, Jr., and Helen F. Ladd, docket No. 5310–74; J. Martin McDonough and Norton C. McDonough, docket No. 5311–74; William L. Marbury and Natalie J. Marbury, docket No. 5375–74; George E. Denman, Jr., and Shirley Ann Denman, docket No. 5444–74; Richardson Harwood and Katherine Harwood, docket No. 6077–74; Edna L. Boyer, Deceased, by John H. Bozic, Jr., Executor of the Estate of Edna L. Boyer, docket No. 6153–74; Katherine D. Harvey, docket No. 6187–74; John J. DeFraine and Agnes C. DeFraine, docket No. 8602–74.

OPINION

TANNENWALD, *Judge:* This matter is before the Court on petitioners' motion for summary judgment, pursuant to Rule 121, Tax Court Rules of Practice and Procedure. The sole issue for our decision is whether the acquisition of stock of Hartford Fire Insurance Co. (Hartford) by International Telephone & Telegraph Corp. (ITT) qualified, as a matter of law, as a reorganization within the meaning of section 368(a)(1)(B),[2] with the result that petitioners are not taxable on any gain on the receipt of stock of ITT in exchange for their Hartford stock. See sec. 354(a).

The table below sets forth the amount of deficiency determined by respondent in each petitioner's Federal income tax for the calendar year 1970, the residence of each petitioner at the time of filing the petition herein, and the place where each petitioner filed his income tax return for the year at issue:

| Docket No. | Deficiency | Residence | Place of filing[3] |
|---|---|---|---|
| 2914-74 | $42,450.71 | Georgetown, S.C. | District Director, District of South Carolina |
| 4828-74 | 1,674.00 | Portland, Ore. | Ogden, Utah |
| 4953-74 | 2,192.81 | Newark, Del. | Philadelphia, Pa. |
| 5105-74 | 2,781.85 | Rancho Santa Fe, Calif. | Ogden, Utah |
| 5122-74 | 46,207.00 | Garrison, Md. | Philadelphia, Pa. |
| 5232-74 | 15,452.93 | Worcester, Mass. | Andover, Mass. |
| 5305-74 | 7,651.00 | Tucson, Ariz. | Ogden, Utah |
| 5309-74 | 43,962.66 | Lynnfield, Mass. | Andover, Mass. |
| 5310-74 | 4,851.72 | Wayne, Maine | Andover, Mass. |
| 5311-74 | 12,256.13 | Sparks, Md. | Philadelphia, Pa. |
| 5375-74 | 6,601.00 | Baltimore, Md. | Philadelphia, Pa. |
| 5444-74 | 1,248.57 | Spokane, Wash. | Ogden, Utah |
| 6077-74 | 55,778.45 | Natick, Mass. | Andover, Mass. |
| 6153-74 | 13,202.00 | Meadville, Pa. | Philadelphia, Pa. |
| 6187-74 | 41,454.28 | Princeton, N.J. | Philadelphia, Pa. |
| 8602-74 | 1,684.74 | Scranton, Pa. | Philadelphia, Pa. |

Petitioners are all individuals who were shareholders of Hartford until they accepted ITT's offer, dated May 26, 1970, and exchanged their Hartford stock for ITT stock.

ITT first became interested in Hartford in 1968 and approached Hartford in October 1968 to suggest the possibility of a merger. ITT's overture was at that time rejected by Hartford,

---

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise stated.

[3]Unless otherwise indicated, the place of filing is an Internal Revenue Service Center.

which was interested in pursuing its own program of diversification and acquisition.

In November 1968, ITT learned that a 6-percent block of Hartford's voting stock (1,282,948 shares) was for sale and began considering purchasing it. Harold S. Geneen, chairman of the board of ITT, met twice with Harry V. Williams, chairman of the board of Hartford, together with representatives of both companies, informed him of the prospective purchase, and assured him that ITT would not attempt to acquire control of Hartford against the will of Hartford's board of directors and management. Upon that assurance, Williams did not object to ITT's purchase of the 6-percent block of Hartford stock. He reiterated, at that time, that Hartford was interested in pursuing its own program of diversification and acquisition but agreed not to take any action that would preclude affiliation with ITT. On November 8, 1968, ITT offered to purchase for cash the 6-percent block of Hartford shares from a mutual fund managed by Insurance Securities, Inc.; the offer was accepted on November 10, 1968, and the purchase was subsequently consummated.

Between November 12, 1968, and January 10, 1969, ITT purchased on the open market 458,000 shares of Hartford, and on March 13, 1969, it purchased 400 shares of Hartford from Hamilton Management Corp., a subsidiary of ITT at that time. All of these purchases were made for cash. ITT then owned approximately 8 percent of Hartford's voting stock.

Solely for the purpose of this motion, petitioners concede that all of the foregoing purchases were made for the purpose of furthering ITT's efforts to acquire Hartford.

On December 23, 1968, ITT submitted a written proposal for a "combination and pooling of interests" of ITT and Hartford pursuant to which ITT would exchange 1 share of its new $2 cumulative convertible voting preferred stock for each share of Hartford's issued and outstanding voting common stock (Hartford's only stock). The proposal was rejected by Hartford, which then formulated its own proposal, and, on April 9, 1969, a provisional plan and agreement of merger was executed by both companies. Pursuant to the agreement, the ITT Hartford Insurance Corp., a wholly owned subsidiary of ITT formed for the purpose of this transaction, would be merged into Hartford. Each share of Hartford stock would be converted into a share of

ITT $2.25 voting cumulative convertible preferred stock and the stock of the subsidiary would be converted into Hartford voting common stock, with the result that Hartford would be a wholly owned subsidiary of ITT. The agreement was conditioned upon the requisite approval, under State law, of the shareholders of the two corporations and of the Connecticut Insurance Commissioner. Hartford had an unqualified right to terminate the agreement if it believed there was any likelihood that antitrust litigation would be initiated. In June 1969, the Department of Justice announced it would seek to enjoin the proposed merger under the Federal antitrust laws. On June 24, 1969, Hartford recommended that its shareholders approve the merger notwithstanding the threat of litigation. In August 1969, the Department of Justice filed in the United States District Court for the District of Connecticut a motion to enjoin the merger, which was denied in October 1969.

On October 13, 1969, the Internal Revenue Service issued a private letter ruling stating that, for Federal tax purposes, the formation of the ITT Hartford Insurance Corp. and its merger into Hartford would be disregarded and the transaction would constitute a reorganization within the meaning of section 368(a)(1)(B) if ITT, prior to the date on which the Hartford shareholders voted to approve or disapprove, unconditionally disposed of the Hartford stock it had previously purchased by sale to third parties. Later in the same month, the Internal Revenue Service issued a supplemental ruling approving a proposed sale of such stock by ITT to an Italian bank.

On June 26, 1969, the shareholders of ITT approved the merger and on November 10, 1969, the shareholders of Hartford approved it.

On December 13, 1969, the Connecticut Insurance Commissioner refused to approve the merger. ITT then proposed to proceed with an exchange offer to the shareholders of Hartford on the same terms which they would have obtained via the merger. After public hearings and the imposition of certain requirements relative to post-acquisition operation of Hartford, the Connecticut Insurance Commissioner approved the exchange offer on May 23, 1970.

On May 26, 1970, ITT made the exchange offer to all Hartford shareholders. More than 95 percent of Hartford's then-issued and outstanding stock, including that held by petitioners, was

tendered in response to ITT's offer. The only consideration given or to be given in the exchange was ITT voting stock.

In 1974, the Internal Revenue Service retroactively revoked its supplemental ruling, which had approved ITT's sale of Hartford stock acquired for cash to an Italian bank, on the grounds that the ruling request contained misstatements and omissions of material facts and that the transaction was not carried out in the manner stated. The pleadings indicate that the original ruling was also revoked retroactively. The parties agree that the revocation of the rulings is not relevant to petitioners' motion for summary judgment. For purposes of this motion, the facts are viewed as if ITT had not disposed of the Hartford stock which it purchased prior to the tender offer.

The question presented is whether the 1970 exchange by petitioners of their Hartford stock for ITT stock was pursuant to a plan of reorganization with the result that no gain or loss should be recognized on the exchange. See secs. 354(a) and 368(a).

Petitioners claim that ITT's acquisition of Hartford stock was a reorganization as defined in section 368(a)(1)(B)[4] (hereinafter referred to as a (B) reorganization). They contend that the term "plan of reorganization" in section 354(a) encompasses only the 1970 exchange offer which did not involve any cash consideration, i.e., that the previous cash purchases were not part of the "plan" and should therefore not be taken into account or (2) that the cash purchases should in any event not be counted, since the 1970 acquisition, standing by itself, constituted a (B) reorganization because only ITT voting stock was exchanged for Hartford stock in one transaction, over 80 percent of Hartford's stock was

---

[4]SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

  (1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

    \*        \*        \*        \*        \*        \*

  (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);

    \*        \*        \*        \*        \*        \*        \*

  (c) CONTROL.—For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

involved in that exchange, and therefore the "solely for * * * voting stock" requirement of section 368(a)(1)(B) has been satisfied.

Respondent's position is that the requirements of section 368(a)(1)(B) are such that the prior cash purchases of Hartford stock by ITT disqualify the 1970 exchange from treatment as a (B) reorganization.

We address petitioners' second contention first. In so doing, we emphasize at the outset that respondent concedes that, irrespective of the impact of the pre–1970 stock purchases, the "voting stock" requirement of section 368(a)(1)(B) and the conditions of "control" of section 368(c) have been met. The only issue, in respect of petitioners' second contention, relates to the proper interpretation of the word "solely" in section 368(a)(1)(B). Each party has indulged in extensive analysis of the underlying legislative history and the decided cases, asserting that such sources leave no doubt of the correctness of his interpretation. However, as will subsequently appear, the sources relied upon do not have the asserted degree of clarity and, in point of fact, the particular circumstances involved herein are different from those involved in any of the previously decided cases. As a consequence, we are confronted, in respect of petitioners' second contention, with a case of first impression.

The legislative history of the predecessors of section 368(a)(1)(B) has been thoroughly reviewed in prior judicial opinions and we will therefore not repeat that history, except to the extent we deem it necessary to an understanding of what is involved herein. See *Commissioner v. Turnbow*, 286 F.2d 669 (9th Cir. 1960), affd. 368 U.S. 337 (1962); *Mills v. Commissioner*, 39 T.C. 393 (1961), revd. 331 F.2d 321 (5th Cir. 1964); *Howard v. Commissioner*, 238 F.2d 943 (7th Cir. 1956), revg. 24 T.C. 792 (1955). We note, however, the Supreme Court's observations that the legislative history is "inconclusive" and that "no more can fairly be said of the Commissioner's Regulations." See *Turnbow v. Commissioner*, 368 U.S. 337, 344 n. 8 (1961).[5]

The basic policy behind the reorganization provisions is to allow deferral of taxation where a business enterprise is

---

[5]Although *Turnbow* involved an issue not presented herein (i.e., whether the "boot" provisions applied to a transaction that was concededly not a reorganization), the legislative history and one of the regulations referred to by the Supreme Court (Treas. Regs. 118, sec. 39.112(g)–(1)(c)) dealt with the question of what constitutes a reorganization, including a (B) reorganization.

continued in a different corporate form and there is continuity of shareholder investment. *Bazley v. Commissioner*, 331 U.S. 737 (1947). The genesis of the current provisions can be traced to the Revenue Act of 1924. Sec. 203, Revenue Act of 1924, 43 Stat. 256. However, it was not until the Revenue Act of 1934, 48 Stat. 680, that Congress restricted the nature of the consideration that could be given by the acquiring corporation to obtain stock or assets of another corporation. The lack of such a restriction had enabled astute taxpayers to escape taxation on what were essentially sales by casting them in the form of reorganizations. To combat this problem, the 1934 Act restricted the consideration given by the acquiring corporation in an acquisition of stock or assets (other than a statutory merger) to voting stock.[6] H. Rept. 704, 73d Cong., 2d Sess. 12–14 (1934), 1939–1 C.B. (Part 2) 554, 563–565; S. Rept. 558, 73d Cong., 2d Sess. 16–17 (1934), 1939–1 C.B. (Part 2) 586, 598–599. The predecessor of section 368(a)(1)(B) and (C) in the 1934 Act read as follows:

The term "reorganization" means * * * (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation * * * [Sec. 112(g)(1), Revenue Act of 1934, 48 Stat. 705.]

After the Internal Revenue Code was enacted in early 1939, the Revenue Act of 1939, 53 Stat. 862, was enacted later in that same year. Section 213 of that Act, 53 Stat. 870, amended section 112(g)(1) of the 1939 Code to permit the acquiring corporation in an asset acquisition to assume liabilities of the acquired corporation[7] and the provisions for stock and asset acquisitions were separated. The pertinent provisions of the 1939 Code, as thus amended, read as follows:

The term "reorganization" means * * * (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the

---

[6]To prevent the same abuses, the courts were at this time developing the continuity-of-interest doctrine. See *LeTulle v. Scofield*, 308 U.S. 415 (1940); *Helvering v. Minnesota Tea Co.*, 296 U.S. 378 (1935); *Pinellas Ice Co. v. Commissioner*, 287 U.S. 462 (1933); *Cortland Specialty Co. v. Commissioner*, 60 F.2d 937 (2d Cir. 1932).

[7]The purpose of this amendment was to avoid the result mandated by *United States v. Hendler*, 303 U.S. 564 (1938). See H. Rept. 855, 76th Cong., 1st Sess. 5, 18–19 (1939), 1939–2 C.B. 504, 507, 518–519; S. Rept. 648, 76th Cong., 1st Sess. 3 (1939), 1939–2 C.B. 524, 525.

acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, or (D) * * * [Sec. 112(g)(1), I.R.C. 1939.]

In 1954, the language defining a (B) reorganization was further amended to make it clear that a so-called creeping acquisition was permissible. See n. 4 *supra;* S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 273 (1954).

Respondent relies heavily upon the judicial history of the (B) reorganization provision contained in section 112(g)(1) of the Internal Revenue Code of 1939 (set forth on pp. 733–734) and its predecessor provisions. He also argues that other amendments to the reorganization provisions, enacted in and since 1954, particularly when coupled with such judicial history, support his position herein as to the construction to be given to the word "solely" in section 368(a)(1)(B).

The seminal decision, upon which the subsequently decided cases and respondent herein heavily rely, is *Helvering v. Southwest Consolidated Corp.,* 315 U.S. 194 (1942). In that case, the taxpayer acquired substantially all of the assets of another corporation in exchange for stock, warrants, and cash. The Supreme Court held that under the 1934 Act, which described asset and stock acquisitions in a single subparagraph (see p. 733 *supra*), the transaction was not a reorganization because the assets of the transferor had not been acquired solely for voting stock but rather had been acquired for stock, warrants (which the Court held were not to be treated as stock for this purpose), and cash. In the course of its opinion, the Court stated: " 'Solely' leaves no leeway" (315 U.S. at 198). It is this language and the reliance thereon by other courts in subsequent judicial opinions which constitute the fulcrum of respondent's position herein. Respondent emphasizes that the Court did not say that it was enough if substantially all the assets were acquired for voting stock and that therefore the clear implication is that acquiring the requisite percentage of stock in one transaction in which no other consideration is furnished is not necessarily enough to qualify for a (B) reorganization.

We think respondent reads too much into *Southwest Consolidated Corp.* Perhaps the most important distinction is that that

case involved an *asset* rather than a *stock* acquisition and the furnishing of nonvoting stock consideration. It is obvious that, in such a situation, i.e., an acquisition of *assets*, it is virtually impossible to bifurcate, the transaction and determine which assets were acquired solely for the permissible consideration. Thus, there is a basic difference between an asset and stock acquisition. In this connection, we note that the Court couched its analysis only in terms of the acquisition of assets and properties and made no reference to acquisition of stock. See 315 U.S. at 198–199. Beyond this distinction, it should be noted that, in *Southwest Consolidated Corp.*, stock represented only about 63 percent of the total consideration, so it could not be argued that the "boot" was a negligible part of the consideration and that therefore substantially all the assets were acquired for stock.[8] Compare *Turnbow v. Commissioner*, 368 U.S. 337 (1961), with *Mills v. Commissioner*, 39 T.C. 393 (1962).

Clearly, in *Southwest Consolidated Corp.*, the Court did not decide the issue now before us which involves a situation where, not only is a separate allocation of the consideration furnished feasible, but also where the 80-percent requirement is met in one transaction in which there is a total absence of impermissible consideration. Accordingly, while we recognize that the oft-quoted language, " 'Solely' leaves no leeway" (see p. 734 *supra*), may well require that "solely" be literally construed (see, e.g., *Mills v. Commissioner, supra* at 399), we do not feel compelled to give that word a pervasive rigidity in determining whether the ITT-Hartford transaction constituted a (B) reorganization. See n. 11 *infra*. Our view is reinforced by the subsequent decision of the Supreme Court in *Turnbow v. Commissioner, supra*, wherein a similar question was left open and the Court made no reference to *Southwest Consolidated Corp.* See 368 U.S. at 344. See also pp. 737–738 *infra*.[9]

---

[8]Respondent claims the boot was negligible but, as we see it, the nonstock consideration was as follows:

| | |
|---|---|
| Cash | $106,680 |
| 2,760 Class A warrants at $29 | 80,040 |
| 18,445 Class B warrants at $25 | 461,125 |
| | 647,845 |

The total nonstock consideration is about 37 percent of $1,766,695, the fair market value of the assets.

[9]It is not without significance that, in recent years, courts have loosened what had previously been thought to have been the strict interpretation of "mere change in identity, form, or place of organization" language (now contained in sec. 368(a)(1)(F) mandated by the Supreme Court in

Nor do we think that the other cases, upon which respondent relies, are controlling herein. Although they contain language supporting respondent's position, all of them deal with factual situations which differ from the case before us. In general, these cases fall into two categories. The first category involves a situation where the 80-percent requirement of the statute could not be met without taking into account prior acquisitions. *Lutkins v. United States*, 312 F.2d 803 (Ct. Cl. 1963); *Commissioner v. Air Reduction Co.*, 130 F.2d 145 (2d Cir. 1942), revg. and remanding a Memorandum Opinion of this Court; *Pulfer v. Commissioner*, 43 B.T.A. 677 (1941), affd. per curiam 128 F.2d 742 (6th Cir. 1942).[10] These cases are readily distinguishable on the simple ground set forth in *Lutkins*, namely, that, since it was necessary to look back to earlier acquisitions, the taxpayer could not pick and choose which acquisitions to use. See 312 F.2d at 805. Clearly, no such looking back is required herein to find the necessary 80 percent. Indeed the Court of Claims, in *Lutkins*, specifically noted that it was not dealing with a situation where 80 percent of the stock of the acquiring corporation was acquired at one time. See 312 F.2d at 805. Moreover, all these cases dealt with pre–1954 "creeping" acquisitions—a type of transaction whose status was doubtful under the 1939 Code. S. Rept. 1622, *supra* at 273.

The second category involves situations where there was one transaction in which more than the 80-percent amount was acquired *and* impermissible consideration was furnished as part of the transaction. *Turnbow v. Commissioner*, 368 U.S. 337 (1961); *Mills v. Commissioner*, 39 T.C. 393 (1962), revd. 331 F.2d 321 (5th Cir. 1964); *Howard v. Commissioner*, 24 T.C. 792 (1955), revd. on other grounds 238 F.2d 943 (1956).

In *Mills*[11] and *Turnbow, each shareholder* whose stock was being acquired *got cash*. These cases are obviously distinguishable. In *Howard*, upon which respondent heavily relies, Truax-

---

*Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194 (1942). See *Aetna Casualty & Surety Co. v. United States*, 568 F.2d 811 (2d Cir. 1976), and *Eastern Color Printing Co. v. Commissioner*, 63 T.C. 27 (1974), and cases analyzed therein.

[10]Although the decision of the Board of Tax Appeals preceded the Supreme Court's decision in *Southwest Consolidated Corp.*, the affirmance by the Sixth Circuit was handed down after the Supreme Court had spoken.

[11]It is interesting to note that in *Mills* the Fifth Circuit considered that we had carried a literal interpretation of the word "solely" too far and that respondent has agreed with this view. See Rev. Rul. 66–365, 1966–2 C.B. 116.

Traer Coal Co. acquired all of the outstanding stock of Binkley Coal Co. in one transaction, exchanging solely its own voting stock for 80.19 percent of Binkley's voting stock and paying cash for the balance.[12] The taxpayer argued that, although the transaction involved the payment of cash, the statutory requirements of a (B) reorganization had nevertheless been met because in excess of 80 percent of the Binkley stock had been acquired solely for voting stock of Truax-Traer Coal. Although we recognized the "force" of the taxpayer's argument that the objectives of the statute might well have been met (see 24 T.C. at 804), we felt bound by prior cases, particularly *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194 (1942), to hold that the statute required that whatever stock was obtained in one transaction must be acquired solely for voting stock. The Seventh Circuit also recognized that there was "persuasion" in the taxpayer's argument (see 238 F.2d at 945) but felt similarly constrained to reject it.

The fact of the matter is that *Howard* is factually distinguishable (aside from the circumstances set forth in n. 12 *supra*), because some stockholders involved in the one exchange transaction (see n. 18. *infra*) received cash. In *Turnbow v. Commissioner, supra,* which involved the application of the so-called "boot" provisions to exchanges not qualifying as reorganizations (the issue on which this Court was reversed in *Howard*), the Government conceded that the conclusion of *Howard,* insofar as it involved the issue of the existence of a (B) reorganization, was debatable[13] and the Supreme Court left the

---

[12]The facts of *Howard* differ from the facts herein in that all of the shareholders from whom 80.19 percent of the voting stock of Binkley was acquired did not receive only voting stock in exchange. Specifically, Truax-Traer acquired 3,683 shares (79.8 percent) of Binkley from shareholders who received only voting stock. It acquired 100 shares from Parsons College, giving voting stock in exchange for 17 shares and paying cash for 83 shares. When the 17 shares acquired from Parsons College for stock are added to the other shares acquired for stock, the total is 3,700 shares, or 80.19 percent. The balance of Binkley's outstanding stock (831 shares) was acquired from others for cash.

In *Howard,* respondent argued, in the alternative, that the statute requires stockholders of at least 80 percent of the stock of the acquired corporation to receive in exchange for their stock only stock of the acquiring corporation. (24 T.C. at 804.) Such a requirement is met by this case but was not met in *Howard.* We did not reach this argument in *Howard,* although clearly, if the Parsons College shares of Binkley were eliminated from the calculation of the Binkley shares acquired solely for Truax-Traer Coal voting stock, the 80-percent requirement for a (B) reorganization would not have been met.

[13]The following is the full pertinent text of the Government's position:

"It cannot be said with certainty, for that matter, that there could not be 'other property' in a transaction qualifying as a 'B' or 'C' reorganization. While those definitions do literally require that

question open. See 368 U.S. at 344.[14]

In the light of the foregoing analysis, it can hardly be said that the judicial history of the requirement of a (B) reorganization was sufficiently settled[15] (at least as far as a fact situation such as is involved herein is concerned) to justify the conclusion that subsequent legislation dealing with "consideration" in connection with the reorganization provisions of the Code implies legislative adoption of respondent's position herein. See *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431–432 (1955).

On the contrary, such subsequent legislative action indicates a continuing concern on the part of Congress over too strict an interpretation of the word "solely" and can be said to support petitioners' rather than respondent's position. In 1954, Congress amended the provisions regarding asset acquisitions to permit the use of "boot" to the extent of 20 percent of the value of the assets acquired. Congress' reason for allowing boot in (C) reorganizations was that the restriction to voting stock caused "difficulties in completing transactions where certain shareholders of the transferor corporation may wish to receive property instead of stock in the continuing corporation." S. Rept. 1622, *supra* at 52. In 1971, when Congress added section 368(a)(2)(E),[16]

---

'solely * * * voting stock' be given, that requirement raises questions of interpretation (not involved in this case) that have not yet been finally resolved. For example, since sec. 112(g)(1)(B) requires only that 80% of the stock of another corporation be acquired, it is arguable that the definition is met if the consideration allocable to at least 80% of the stock consists of voting stock, notwithstanding that the acquiring corporation also acquires additional shares (e.g., from dissenting stockholders) for money or other property. That was in fact the situation in the *Howard* case, in which the acquiring corporation gave solely voting stock for 81% of the shares but gave cash to a dissenting minority for the remaining 19%. While the Seventh Circuit held that the cash given the minority precluded a 'B' reorganization, the question is a debatable one and there is no assurance that other courts would follow that decision. [Brief for Government n. 7 at 21.]"

[14] The holding of *Howard* that there was no (B) reorganization has also been criticized by commentators. See A. Vernava, "The Howard and Turnbow Cases and the 'Solely' Requirement of B Reorganizations," 20 Tax L. Rev. 387 (1965); B. Kanter, "Cash in a 'B' Reorganization: Effect of Cash Purchases on 'Creeping' Reorganization," 19 Tax L. Rev. 441 (1964). See also R. Merritt, "Tax-Free Corporate Acquisitions—The Law and the Proposed Regulations," 53 Mich. L. Rev. 911 (1955); S. Toll, "Transfers of Boot in Stock-for-Stock Acquisitions," 15 U.C.L.A. L. Rev. 1347 (1968).

[15]*Howard* was not decided until after the enactment of the 1954 Code. In *Commissioner v. Air Reduction Co.*, 130 F.2d 145 (2d Cir. 1942), the question was a subsidiary issue and may not have attracted much attention. That case is, in any event, factually distinguishable. See p. 736 *supra*.

[16]SEC. 368(a)(2)(E). STATUTORY MERGER USING VOTING STOCK OF CORPORATION CONTROLLING MERGED CORPORATION.—A transaction otherwise qualifying under paragraph (1)(A) shall not be disqualified by reason of the fact that stock of a corporation (referred to in this sub-paragraph as the "controlling corporation") which before the merger was in control of the merged corporation is used in the transaction, if—

(i) after the transaction, the corporation surviving the merger holds substantially all of its properties and of the properties of the merged corporation (other than stock of the controlling

which created a new type of reorganization that has some attributes of a (B) reorganization, the Congress stated that it saw no reason not to allow 20-percent nonstock consideration. S. Rept. 91–1533, p. 2 (1970), 1971–1 C.B. 622, 623; H. Rept. 91–1778, p. 3 (1970).

Nor do we think that respondent can draw any sustenance from the fact that Congress amended section 368(a)(1)(B) in 1954 (permitting creeping acquisitions, see p. 734 *supra*) and again amended it by section 218(a) of the Revenue Act of 1964, 78 Stat. 57 (permitting the use of the stock of the acquiring corporation's parent in lieu of the stock of the acquiring corporation) without making any change in the "solely for * * * voting stock" requirement. To read such legislative action and inaction as blessing respondent's position assumes that the state of the law was in accord with such position at those times. But, as we have seen, that was not the case and thus it is equally possible to assume that Congress made no change to cover the situation involved herein because it felt that such a situation already met the requirements of the statute—a point of view which, of course, would be as erroneous as that of respondent.

Similarly, we are satisfied that any difficulties, which may stem from the lack of a definition of the term "the acquisition" in the 1954 amendment to section 368(a)(1)(B), are not of such a character as to require rejection of petitioners' second contention herein. Granted that amendment eliminated the use of the 80-percent requirement contained directly in that section under the 1939 Code, that same requirement remained in section 368(c) and there is not the slightest suggestion that Congress, in enacting the amendment in 1954, intended to make any substantive change in the meaning of "the acquisition" beyond the addition of liberalizing language permitting creeping acquisitions.

In oral argument, respondent stated that his position was based solely on legislative history and the decided cases, particularly *Howard*, and conceded that no policy considerations, such as the potential for creating "loopholes" in the statute,

---

corporation distributed in the transaction); and

(ii) in the transaction, former shareholders of the surviving corporation exchanged, for an amount of voting stock of the controlling corporation, an amount of stock in the surviving corporation which constitutes control of such corporation.

were involved. Nor has our own independent analysis brought forth any such considerations which might influence our interpretation of the statute and its legislative history. Compare *Commissioner v. Brown*, 380 U.S. 563 (1965), wherein the Supreme Court specifically referred to the fact that it found nothing in the construction of language of the Internal Revenue Code for which the taxpayer had contended and which had been adopted by this Court and the Court of Appeals as being "in a manner contrary to the purpose *or policy* of capital gains provisions of the Code." (See 380 U.S. at 571–572; emphasis supplied.) See also *Fullinwider v. Southern Pac. R.R. Co.*, 248 U.S. 409, 412 (1919) (policy may be used to resolve uncertainty in law).

Respondent's concession that no policy is served by a pervasively rigid interpretation of "solely" in the "solely for * * * voting stock" requirement of a (B) reorganization is reinforced by his numerous rulings allowing that requirement to be circumvented by technical formalities. See Rev. Rul. 72–354, 1972–2 C.B. 216 ("purging" of transaction by transferring stock acquired for cash to an unrelated third party); Rev. Rul. 75–522, 1972–2 C.B. 215 (purchase of stock for cash directly from target corporation); Rev. Rul. 68–285, 1968–1 C.B. 147 (redemption of dissenters' shares for cash by acquired corporation); Rev. Rul. 68–562, 1968–2 C.B. 157 (purchase of 50 percent of target corporation's stock for cash by controlling shareholder of acquiring corporation); Rev. Rul. 73–54, 1973–1 C.B. 187 (payment of acquired corporation's reorganization expenses by the acquiring corporation); Rev. Rul. 56–184, 1956–1 C.B. 190 (dividend of earnings from certain date to closing date of reorganization). Several of such rulings evince a willingness by respondent to imbue the word "solely" with a pristine purity by exalting form over substance—an approach which, particularly in the reorganization area, respondent and a myriad of cases, too numerous to cite, have consistently rejected.

The logic of respondent's position could produce some odd results. If X corporation sought to acquire and did acquire only 80 percent of the outstanding stock of Y corporation solely for voting stock and was content to allow the other 20 percent to remain as a minority, respondent apparently would agree that the requirements of a (B) reorganization had been satisfied. If, however, X corporation sought to acquire 100 percent of the Y

stock (a fact which may not be readily discernible) and acquired 80 percent solely for voting stock at one time but thereafter acquired the remaining 20 percent, or any part thereof, for cash before the 80 percent became "old and cold" (cf. *Kass v. Commissioner*, 60 T.C. 218, 223 (1973), affd. without published opinion 491 F.2d 749 (3d Cir. 1974)), the requirements of a (B) reorganization would not have been met and the exchange for the 80 percent would, under respondent's theory, become retroactively taxable. It is, at the very least, doubtful whether Congress intended section 368(a)(1)(B) to encompass such curious consequences. See *Commissioner v. Brown*, 380 U.S. 563, 571 (1965).

We are not unaware of the conceptual difficulties involved in determining what is "the acquisition" for purposes of a (B) reorganization and that an argument can be made that separating out the 1970 exchange begs the question, or to put it another way, assumes the issue which requires decision. But we do not see the situation in this light. The facts of the matter are that the 1970 exchange, standing by itself, satisfied in every way the literal requirements of section 368(a)(1)(B) and that neither legislative nor judicial history nor policy[17] requires that that exchange (involving in excess of 80 percent of Hartford's stock) not be separated from the other acquisitions of Hartford stock by ITT for cash, at least for the purpose of disposing of the legal issue raised by petitioners' second contention. We take this position with full knowledge that, for the purpose of disposing of that contention, on this motion for summary judgment, we must assume that the pre–1970 cash purchases were part of the "plan of reorganization." But our position, simply stated, is that, in the context of this case, such assumption is of no consequence because the prior purchases are irrelevant.

We hold that where, as is the case herein, 80 percent or more of the stock of a corporation is acquired in one transaction,[18] in exchange for which only voting stock is furnished as consideration, the "solely for * * * voting stock" requirement of section 368(a)(1)(B) is satisfied. Such a situation simply does not involve

---

[17]Whatever policy considerations may be involved relate, in our opinion, to creeping acquisitions where no single acquisition involves 80 percent or more of the stock of the acquired corporation, which is not the situation herein.

[18]In determining what constitutes "one transaction," we include all the acquisitions from shareholders which were clearly part of the same transaction.

a transaction akin to a sale rather than an exchange, which from the beginning has been a fundamental concern of Congress with respect to granting tax-free status under the reorganization provisions. See p. 733 *supra*. In so holding, we emphasize that our decision herein is a narrow one. Thus, our holding does not cover the extent to which creeping acquisitions are now permissible under section 368(a)(1)(B). Moreover, taking our cue from what the Supreme Court did in *Turnbow* (see 368 U.S. at 344), we need not resolve the doubts which may well exist as to the current vitality of *Howard* in respect of the existence of a reorganization within the meaning of section 368(a)(1)(B) where 80 percent of the stock is acquired solely for voting stock from some shareholders and, at about the same time, additional shares are acquired for cash from other shareholders, i.e., the situation which existed in *Howard*.[19]

In view of our holding, we find it unnecessary to consider the other issue on which the parties locked horns, namely, that if the prior cash acquisitions of Hartford stock by ITT were relevant, they should be considered so inextricably interwoven with the 1970 exchange as to disqualify that exchange under section 368(a)(1)(B) on the ground that the "solely for * * * voting stock" requirement was not met.

Petitioners' motion for summary judgment is granted and

*Decisions will be entered for the petitioners.*

Reviewed by the Court.

DRENNEN, FAY, GOFFE, and HALL, *JJ.*, did not participate in the consideration and disposition of this case.

SCOTT, *J.*, concurring: While I agree with the result in this case, I do not agree that *Howard v. Commissioner*, 24 T.C. 792 (1955), revd. on another issue 238 F.2d 943 (7th Cir. 1956), is distinguishable. In my view, the majority does not follow the *Howard* case even though it is not so stated.

---

[19]We also note that, assuming the continued vitality of *Howard*, any attempt to circumvent the decision in that case by splitting what was otherwise intended to be a single transaction into two transactions in order to receive the benefit of our decision herein could be readily dealt with under the rationale of such decisions as *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945).

In our *Howard* opinion at pages 798–799, we specifically found that:

The consideration for the entire 4,615 shares of Binkley was $1,846,000, of which $366,000 was payable in cash and $1,480,000 by the issuance of said 118,400 shares of the Truax-Traer common stock at $12.50 per share * * *

In that opinion we held that the transaction was a part of an entire acquisition, stating at page 802:

each element and term of the plan and agreement as originated, outlined, and consummated was inseparably interrelated, and designed to accomplish but one purpose, the acquisition by Truax-Traer of * * * Binkley * * * [T]here can be no doubt that petitioners did not take part in an exchange of some Binkley stock for stock of Truax-Traer and a separate and unrelated sale of other shares of Binkley stock * * * to Truax-Traer.

Following the above-quoted conclusion in the *Howard* case, we stated the taxpayers' main contention to be (at page 803):

that the acquisition by one corporation of at least 80 per cent of the only class of stock outstanding of another corporation for stock is an acquisition "solely" for stock * * * and qualifies as a tax-free exchange * * * regardless of other consideration given by the transferee corporation for additional stock in excess of the minimum requirement of 80 per cent.

It was this contention of the taxpayers we did not accept in *Howard.*

In the present case, the majority states that petitioners raised two issues, the first of which was that the cash purchases by petitioner of Hartford stock were not part of the plan, and the second, that the cash purchases should, in any event, not be counted since the acquisition of Hartford stock for ITT stock "standing by itself" constituted a (B) reorganization because only ITT voting stock was exchanged for Hartford stock in one transaction, with over 80 percent of the Hartford stock being acquired in that exchange. The majority did not decide the first issue but based its decision on the second issue. Under these circumstances, in my view, whether the cash acquisition was made at the same time as the stock-for-stock acquisition is not a valid distinction between the *Howard* case and the instant case. I would refuse to follow our prior decision in *Howard v. Commissioner, supra.* This would remove any doubt as to our present position. In my view, where 80 percent of the stock of an acquired corporation is acquired solely for voting stock of the acquiring corporation in a single transaction, the requirements

of sections 368(a)(1)(B) and 368(c), I.R.C. 1954, are met whether other stock is acquired for cash before, at the same time, or after the stock for stock transaction.

IRWIN, *J.*, agrees with this concurring opinion.

QUEALY, *J.*, dissenting: In substance, the majority opinion holds that the requirement in section 368(a)(1)(B) that the stock of the acquired corporation must be acquired *solely* for voting stock of the acquiring corporation is satisfied if at least 80 percent of the stock is so acquired, notwithstanding the remainder may have been acquired for cash. In so holding, the majority goes contrary to what has been the position of the respondent, acquiesced in by the tax bar, over the past 40 years. I find no support for—and considerable language inconsistent with—the majority's opinion in the authorities cited therein. In fact, the majority reaches this view, not in reliance upon decided cases, but on the basis of a somewhat nebulous distinction of the facts in those cases. Accepting the validity of that distinction— which I do not—does not justify rewriting the law at this late date.

WILBUR, *J.*, dissenting: I respectfully dissent from the majority opinion. The Court has dealt too casually with a formidable body of directly contrary precedents.

For purposes of the issue we decide, the specific words of the statute before us have been essentially the same since 1934. They require that, to qualify as a (B) reorganization, the acquisition of stock in the target corporation must be "in exchange solely" for voting stock of the acquiring corporation or its parent, and immediately after the acquisition, the acquiring corporation must be in control of the acquired corporation. A question immediately arises: Does this language require that all of the stock of the target corporation acquired be acquired solely for the stock of the acquiring corporation; or if the controlling interest (80 percent or more) is acquired for voting stock, may the remainder be acquired for cash of other property?

Despite what the majority says, this specific question has been litigated in this Court, the Court of Claims, and the Courts of

Appeals, and these courts have squarely and unequivocally held that acquisition of some of the stock of the target corporation for cash is fatal to a (B) reorganization, even though the controlling interest (80 percent or more) is acquired solely for stock.[1]

In *Howard v. Commissioner*, 24 T.C. 792 (1955), revd. on another issue 238 F.2d 943 (7th Cir. 1956), we specifically found that the acquiring corporation acquired control—80.19 percent of the total outstanding shares of the target corporation—solely for voting stock. We stated: "The 3,700 shares of Binkley common stock acquired in exchange for common stock of Truax-Traer constituted *80.19 per cent* of the total outstanding stock of Binkley." (24 T.C. at 800; emphasis added.) The petitioners in *Howard* (like those before us) argued that the acquisition for cash and the acquisition for stock were separate transactions, and that in any event cash acquisitions are permissible as long as the controlling interest was acquired solely for stock. After holding that the "singleness and unity of the transaction in which Truax-Traer acquired [the target corporations] is apparent," (24 T.C. at 801) we stated:

> We now turn to petitioners' main contention which is, in effect, that the acquisition by one corporation of at least 80 per cent of the only class of stock outstanding of another corporation for stock is an acquisition "solely" for stock within the meaning of the definition of a reorganization under section 112(g)(1)(B) * * * [2] [24 T.C. at 803.]

In order to avoid any possible misunderstanding of the question presented, we then succinctly and unequivocally restated the question decided:

> Basically the question before us is whether the statute requires all of the Binkley stock acquired by Truax-Traer in the transaction of June 23, 1950, to have been acquired only ("solely") for stock, or whether it is sufficient if a minimum of ("at least") 80 per cent of the outstanding Binkley stock was acquired for an appropriate amount of Truax-Traer stock, even though the remainder acquired in excess thereof was so acquired for a consideration other than stock. * * * [24 T.C. at 804.]

---

[1]This assumes, of course, that the acquisitions for stock and for cash are not clearly separable. Petitioners' first contention, on which the majority specifically declined to rule, was that the acquisitions for stock and for cash were separable. Petitioners concede, for purposes of the second issue, that the acquisitions were part of the same transaction (not separable), but argues that cash acquisitions are nevertheless permissible as long as the controlling interest (80 percent or more) is acquired solely for stock.

[2]The statutory predecessor of sec. 368(a)(1)(B), I.R.C. 1954.

The issue decided was thus stated and restated with unmistakable precision. And the decision itself was also stated with unmistakable clarity:

We think, however, that the authorities have clearly established the applicable rule of law to be that the consideration for *whatever* stock is acquired by the transferee corporation in a transaction such as that before us *must be solely the transferee's voting stock, and nothing else.* * * * [24 T.C. at 804; emphasis added.]

The Seventh Circuit, in affirming our opinion on this issue, restated and decided the question in equally unequivocal language, after a careful and extensive review of the relevant legislative history:

The primary problem confronting us, then, is the taxable effect of the cash or "boot" transferred by Truax-Traer in its acquisition of 19.81% of the stock of Binkley. *Petitioners urge that the "solely for voting stock" requirement of sec. 112(g)(1)(B) merely refers to the 80% provision and is not in itself an independent requisite*, regardless of the amount of stock acquired. * * *

*        *        *        *        *        *        *

We conclude that because of the cash payment, the transaction in question fails to meet the "solely" requirement of sec. 112(g)(1)(B) of the 1939 Code. * * * [*Howard v. Commissioner*, 238 F.2d 943, 945, 947 (7th Cir. 1956); emphasis added.]

In affirming our decision in *Howard*, the Seventh Circuit, like this Court, relied in part on *Commissioner v. Air Reduction Co.*, 130 F.2d 145 (2d Cir. 1942). In *Air Reduction*, the Second Circuit specifically stated that "about 82% of the Pure Carbonic stock [the target corporation] was acquired for shares of Air Reduction stock [the acquiring corporation] and the balance for cash." (130 F.2d at 146.) The Second Circuit then rejected the taxpayer's argument that this exchange was a (B) reorganization, again in unequivocally clear language:

this theory is not tenable because the definition of reorganization in sec. 112(g)(1)(B) of the 1934 Act, 26 U.S.C.A. Int. Rev. Acts, page 695, contemplates only situations where the exchange is made "solely" for voting stock. Here over 17% of the Pure Carbonic stock was purchased for cash. * * * [130 F.2d 145, 148.]

We again squarely addressed the issue of whether a (B) reorganization permits *any* cash acquisitions of target company stock in *Mills v. Commissioner*, 39 T.C. 393 (1962), revd. 331 F.2d 321 (5th Cir. 1964). In *Mills*, more than 99.9 percent of the target companies' stock was acquired for the voting stock of the

acquiring corporation, the remaining one-tenth of 1 percent being acquired for cash ($27.36 for a fractional share, apparently as a bookkeeping convenience). We again stated in unequivocally clear language:

> We construe the word "solely" as meaning precisely what it purports to mean, namely that the receipt by the stockholders of an acquired corporation of *any consideration whatsoever other than voting stock* forbids a transaction from being a reorganization as defined under section 368(a)(1)(B). * * * We cannot assume that Congress was incapable of expressing a grant of leeway when that was its purpose. [39 T.C. at 400; emphasis added.]

The words "any consideration whatsoever other than voting stock" leave no room for interpretation. And the holding that a cash acquisition of less than one-tenth of 1 percent is not consistent with a (B) reorganization clearly rules out cash for 5, 10, or 20 percent of the stock. Yet without reversing or distinguishing *Mills*, the majority now holds that up to 20 percent of the target company's stock may be acquired for cash consistent with the mandate that the acquisition be "solely" for voting stock.

The dissenting Judges in *Mills* took the majority to task for literally applying the term "solely" to a $27.36 payment for a fractional share, a payment apparently made as a bookkeeping convenience. But the author of the dissenting opinion also stated that "I interpret the word 'solely' as requiring that there be no *consideration* other than voting stock" and suggested that the $27.36 was not additional consideration but simply a rounding off for mathematical convenience. (39 T.C. at 403). In reversing the Tax Court on the basis of this dissent, the Fifth Circuit specifically quoted this statement that the word "solely" requires "that there be no *consideration* other than voting stock." (331 F.2d at 324.) While the Fifth Circuit held that the $27.36 paid in *Mills* for a fractional share "simply [as] a mathematical rounding" was not "consideration," its opinion assumes the validity of the view embraced by all of the Judges of this Court in *Mills* that the word "solely" means that the voting stock is the only consideration that may be given by the acquiring corporation in a section 368(a)(1)(B) reorganization.[3]

But the line of contrary precedents, formidable as it already

[3]And it is clear that the approximately $89 million paid by ITT to acquire 8 percent of Hartford's voting stock in the instant case was additional "consideration."

is, does not terminate here. For in *Lutkins v. United States*, 312 F.2d 803 (Ct. Cl. 1963), the Court of Claims also squarely decided the issue. The court noted that as a result of acquisitions over a considerable period of time that "in 1952 American [the acquiring corporation] owned 94.864 percent of the voting stock of International [the target corporation] which it had obtained solely in exchange for shares of its own voting stock." (312 F.2d at 804.) The court pointed out that over this period of time American had also "purchased on the market an adjusted total of 16,150 shares of International stock which comprised 2.691⅔ percent of that company's outstanding stock." (312 F.2d at 804.)

The Government argued that no (B) reorganization existed because the acquisitions over time could not be combined, *and* that in any event, although 94.864 percent of the voting stock was acquired for voting stock, 2.691 percent was acquired for cash, thus violating the requirement that "solely" voting stock be used. It was only the second contention that the Court of Claims considered and ruled on. Focusing on the use of cash to acquire 2.691 percent of the target company's stock, the court clearly stated the question it decided: "did the acquisition of stock for cash between 1929 and 1951 prevent the 1952 stock for stock exchange from being a reorganization under the terms of section 112(g)(1)(B)." (312 F.2d at 804.) Quoting from and squarely relying on *Howard*, the court held that even though 94.864 percent of the stock had been acquired for voting stock, the acquisition of 2.691 percent for cash violated the requirement that stock be acquired "solely" for voting stock. See 312 F.2d at 805.[4]

Thus, in *Howard, Lutkins,* and *Air Reduction,* the Second Circuit, the Seventh Circuit, and the Court of Claims all held that the acquisition of some stock for cash is incompatible with a reorganization even though 80 percent or more of the stock is acquired solely for stock. This also clearly appears to be the view

---

[4]The court passed by the respondent's first argument and went on to hold that, even assuming 80 percent of the target corporation's stock was acquired only for voting stock, the small cash acquisition of 2.691 percent in itself violated the requirement that "solely" voting stock be used. For this reason, the court did not "find it necessary to consider the question of whether the 1912 exchange of stock 'solely' for stock and the 1952 exchange can be combined in order to meet the 80 percent requirement of section 112(g)(1)(B)." *Lutkins v. United States,* 312 F.2d 803, 805 (Ct. Cl. 1963). However, in response to an argument by the taxpayers, the court noted that "we do not see how the plaintiff can take advantage of the unrelated 1912 exchange in order to meet the 80 percent requirement and at the same time disregard the similarly unrelated cash purchases." (312 F.2d at 805.)

of the Fifth Circuit (*Mills v. Commissioner*, 331 F.2d 321 (5th Cir. 1964)). In *Howard* ("voting stock, and nothing else") and *Mills* ("any consideration whatsoever other than stock forbids a transaction from being a reorganization"), we have also squarely decided this issue in accord with these decisions. It is therefore more than a little surprising to read in the majority opinion that "we are confronted * * * with a case of first impression."[5]

The majority opinion creates many potential problems, and they are not trivial. *Mills* was undoubtedly too literal in not allowing a de minimis exception to the "solely" voting stock requirement for fractional shares. But we there noted that "where a taxpayer has a loss which he wishes to recognize, adding a minimal amount of other consideration to what would otherwise be a (B) reorganization will compel such recognition." (39 T.C. at 401.) Tax advisers have long been aware of this and have undoubtedly structured many transactions for years that are still open to take advantage of this rule. These transactions will, in the light of the majority opinion, now be retroactively clouded with uncertainty, litigation may ensue, and the results may in some cases be the opposite of those the parties planned for and reasonably anticipated.

And the problems do not end there. For we must ask what rule of law the majority opinion establishes. By way of answer, the majority opinion includes this summary:

> We hold that where, as is the case herein, 80 percent or more of the stock of a corporation is acquired in *one transaction* in exchange for which only voting stock is furnished as consideration, the "solely for voting stock" requirement of section 368(a)(1)(B) is satisfied. * * * [Emphasis added.]

The key words here are "one transaction." The majority tells us that "in determining what constitutes '*one transaction*,' we include all the acquisitions from shareholders which were clearly part of the *same transaction*." (Emphasis added.) To understand why this tautology is so confusing, we must realize that it does not respond to the issue argued and decided. Petitioners' first argument was that "the prior cash purchases were not part of

---

[5]The majority distinguishes most of these precedents by referring to alternative issues not considered by the courts involved (i.e., prior acquisitions), or facts not relevant under the statute nor of any significance to the issue decided (i.e., that although 80.19 percent of the stock was acquired for voting stock in *Howard*, one of the shareholders who received stock also received a small amount of cash). It is also implied that the precedents are really more relevant to asset acquisitions than stock for stock. However, *all* of the precedents above cited deal with (B) transactions—stock for stock.

the 1970 exchange offer reorganization,"—that is, the cash and stock acquisitions were different transactions. Although the majority opinion expressly passes over this issue, it nevertheless holds that the acquisition of control for stock was one transaction, and the acquisition of additional stock for cash was another transaction—that is, they were different transactions.

Yet for purposes of their second argument (the one the majority sustains), petitioners concede throughout their brief that the cash and voting stock acquisitions were part of one transaction, arguing only that this is inconsequential since cash acquisitions of up to 20 percent are permissible. Thus, petitioners argued that "Even if ITT's cash purchases in 1968 and early 1969 could be viewed *as parts of the 1970 exchange offer reorganization," cash acquisitions are permissible as long as at least 80 percent of the target corporation's stock is acquired solely for voting stock. (Emphasis added.) That is, the cash and voting stock acquisitions were both "parts of the 1970 exchange offer reorganization;"* or put another way, they were both parts of the same transaction—the 1970 exchange offer reorganization.[6]

Yet despite this, in summarizing its holding, the majority fragments the cash and voting stock acquisitions into two transactions, focusing only on the latter and ignoring the former. They lay the foundation for their holding with this surprising statement:

The facts of the matter are that the 1970 exchange, *standing by itself,* satisfied in every way the literal requirements of section 368(a)(1)(B) and that neither legislative nor judicial history nor policy requires that that exchange (involving in excess of 80 percent of Hartford's stock) *not be separated from the other acquisitions of Hartford stock by ITT for cash,* at least for the purpose of disposing of the legal issue raised by petitioners' second contention. * * * [Emphasis added; fn. ref. omitted.]

But again petitioners' first argument, which the majority passes over, asked that the cash and voting stock acquisitions be separated; their second argument (on the basis of which the majority decides the case), concedes they are part of the 1970 exchange offer reorganization.

In light of petitioners' concession in this second argument, what rule then does the majority adopt? What do they mean by

---

[6]And if these are parts of the same transaction, why are they not parts of "one transaction," particularly when the majority tells us that the term "one transaction" means the "same transaction."

"one transaction"? They tell us "one transaction" means the "same transaction," yet petitioners concede for purposes of the issue decided that all of the acquisitions before us—both for cash and for stock—were part of the same transaction (the 1970 exchange offer reorganization).

Additionally, the majority appears to recognize that under the law as it now stands, if 80 percent of the stock is acquired solely for voting stock, and at about the same time, additional shares are acquired for cash, the cash acquisitions are inimical to a reorganization. On the other hand, if the cash acquisitions are sufficiently remote from the stock acquisitions—are "old and cold"—the cash acquisitions are not inimical to a reorganization. Where does the majority's rule fit into this settled and well understood structure? In view of the majority's use of the phrase "one transaction" as related to the facts before us, how is it to be distinguished from our common understanding and prior usage of the term "same transaction"?

Unfortunately, the confusion does not end here. For in integrating this new rule with existing doctrine, the practitioner is warned by the majority that:

assuming the continued vitality of *Howard,* any attempt to circumvent the decision in that case by splitting what was otherwise intended to be a single transaction into two transactions in order to receive the benefit of our decision herein could be readily dealt with under the rationale of such decisions as *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945).

This stern admonition against doing what the majority itself has done adds even further confusion. For can anyone now understand what is meant by "one transaction," and "two transactions," or how these terms will be applied to the existing rules as amended by whatever rule the majority has promulgated?

This substitution of uncertainty for certainty is both undesirable and unnecessary. As we observed in a similar context:

The respondent is an ubiquitous silent partner in all commercial transactions, claiming priority for his share of the profits—often the largest single share. The other participants in commercial transactions—suppliers, lenders, investors, etc,—need to know the terms of respondent's participation. As concerns the issue before us, we regard the terms of his participation as well settled. * * * [*Putoma Corp. v. Commissioner,* 66 T.C. 652, 671, 672, (1976), on appeal (5th Cir., Mar. 14, 1977, by respondent, and Apr. 11, 1977, by petitioner.]

The statute we interpret was enacted nearly one-half century

ago. During the interim, the Courts have squarely decided the specific issue before us. The issue was a close one, but it was fairly raised and carefully decided. If there is to be an end to litigation at some point consistent with judicial economics; if some certainty and stability are to be provided the lenders, investors, and businessmen who adapt business organizations to current requirements; if predictability is a tool to be made available to legal advisers in complex business transactions; if the courts, striving for at least a minimum level of doctrinal continuity must be aware of what their colleagues elsewhere have done and are doing; and if Congress, in amending the statute is to have any working understanding of the state of the law being amended, then we must adhere to a substantial and undeviating body of precedent developed over nearly half a century of experience when it is directly dispositive of the issue. That is what I would do in this case.

DAWSON, SIMPSON, and WILES, *JJ.,* agree with this dissenting opinion.