Arden S. HEVERLY and Sophia
S. Heverly

v.

COMMISSIONER OF INTERNAL
REVENUE.

(Tax Court No. 4953–74)

Edna L. BOYER, Deceased, by John H.
Bozic, Jr., Executor of the Estate of
Edna L. Boyer

v.

COMMISSIONER OF INTERNAL
REVENUE.

(Tax Court No. 6153–74)

Katherine D. HARVEY

v.

COMMISSIONER OF INTERNAL
REVENUE.

(Tax Court No. 6187–74)

John J. DeFRAINE and Agnes
C. DeFraine

v.

COMMISSIONER OF INTERNAL
REVENUE.

(Tax Court No. 8602–74)

Appeal of COMMISSIONER OF
INTERNAL REVENUE.

No. 79–1985.

John Lewis PIERSON

v.

UNITED STATES of America,
Appellant.

No. 79–2192.

United States Court of Appeals,
Third Circuit.

Argued Feb. 15, 1980.

Decided March 25, 1980.

Ernest J. Brown (argued), M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Tax Div., Dept. of Justice, Washington, D. C., for appellants; James W. Garvin, Jr., U. S. Atty., Wilmington, Del., of counsel.

John H. Schafer (argued), Newman T. Halvorson, Jr., Charles Lister, Covington & Burling, Washington, D. C., Stephen D. Gardner (argued), James S. Eustice, Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for appellees; Robert A. Kagan, Edwin A. Kilburn, New York City, of counsel.

Before ALDISERT, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

■ The major issue presented by these consolidated appeals from the United States Tax Court and the United States District Court for the District of Delaware is whether the use of consideration other than voting stock is allowable in a tax deferred stock for stock reorganization as defined in § 368(a)(1)(B) of the Internal Revenue Code, 26 U.S.C. § 368(a)(1)(B). In the vernacular, the question is whether "boot" may be used in a clause B corporate reorganization. Both courts below agreed with the taxpayers that other consideration is allowable so long as "control" of the target corporation is obtained "solely for . . . voting stock," and thus allowed them to defer recognition of their gain under § 354(a)(1), 26 U.S.C. § 354(a)(1). We hold that, in a stock for stock transaction in which control is achieved, the acquiring corporation may exchange no consideration other than voting stock to effect a tax deferred clause B reorganization. We therefore reverse.

### I.

The facts have been detailed in the trial court opinions, *Reeves v. Commissioner*, 71 T.C. 727, 728–31 (1979), and *Pierson v. United States*, 472 F.Supp. 957, 958–60 (D.Del. 1979), so we need not elaborate them at length. The transaction at issue involved the acquisition of stock in Hartford Insurance Company by International Telephone and Telegraph Corporation. ITT first made overtures to the management of Hartford in 1968, suggesting either an acquisition of Hartford by ITT or merger of Hartford into ITT. Hartford rejected these immediate proposals, but apparently gave no definitive veto to a future amalgamation. ITT subsequently purchased for cash, in two block transactions and various open market transactions, approximately eight percent of Hartford's outstanding stock.

In December 1968, ITT proposed merger terms to Hartford, leading to a provisional agreement on April 9, 1969, to merge Hartford into a wholly owned subsidiary of ITT. The Antitrust Division of the Department of Justice commenced litigation to enjoin the merger in August 1969, but its motion for preliminary injunction was denied in October 1969. On October 13, 1969, the Internal Revenue Service issued a private letter ruling advising ITT and Hartford that the proposed merger would be within § 368(a)(1)(B) if ITT unconditionally divested itself of the Hartford stock it had previ-

ously purchased for cash. On October 21, the IRS ruled that ITT's proposed sale of the stock to Mediobanca, an Italian bank, would constitute an unconditional disposition, and ITT consummated the sale.

Although ITT overcame the obstacles erected by the Antitrust Division and the IRS, and obtained approval for the transaction from the Hartford and ITT shareholders, the merger fell through when the Connecticut Insurance Commissioner withheld his approval. ITT and Hartford then proposed an offer to the Hartford shareholders of ITT stock for their Hartford stock. The Connecticut Insurance Commissioner ultimately approved this plan, and ITT submitted the exchange offer to the Hartford shareholders on May 26, 1970. By June 8, 1970, over ninety-five percent of the Hartford shares, including those held by Mediobanca, had been tendered.

In March 1974, the IRS, alleging misrepresentations in ITT's application for the private letter ruling regarding the sale of Hartford stock to Mediobanca, retroactively revoked its ruling that deemed that sale an unconditional disposition of the stock. The effect of the revocation, according to the IRS, was to disqualify the transaction from treatment under clause B and thus to preclude tax deferral of the gain realized by the Hartford shareholders when they exchanged their Hartford stock for ITT stock. The Service reasoned that clause B allows no consideration other than voting stock, and that the purchase for cash of eight percent of Hartford stock by ITT precluded treatment of the transaction under clause B. As a result, the Service assessed tax deficiencies against the former Hartford shareholders, including the appellees here.[1]

## II.

In the trial courts, taxpayers sought deferral of their gain under § 354(a) of the Internal Revenue Code, 26 U.S.C. § 354(a), arguing that they participated in a corporate reorganization. They rely on § 368(a)(1)(B), which defines "reorganization" as an acquisition, solely for voting stock, of stock of another corporation, if the acquiring corporation is in "control" of the other corporation immediately after the exchange.

The two courts below granted taxpayers' motion for summary judgment, though on somewhat different grounds. Before both courts, taxpayers asserted alternative grounds for summary judgment. They argued initially that the cash purchases of stock by ITT in 1968 were not part of the same "plan of reorganization" as its acquisition of ninety-five percent of Hartford's stock in 1970. The requirement that the exchange be "solely for voting stock" was thus fulfilled because the prior cash purchases should not be considered. Their alternative argument was that even if the cash purchases were part of the plan of reorganization, they constituted a separate "transaction" from the exchange of stock for stock. Under their interpretation, clause B requires only the acquisition of "control" of the target corporation "solely for . . . voting stock" of the acquiring corporation. Thus, ITT's acquisition was within clause B because the stock transaction gave it "control" of Hartford. Both courts accepted the second argument and, concluding that it was fully dispositive, declined to address the first argument.

### A.

The appeal from the tax court emanates from a case styled *Reeves v. Commissioner*, 71 T.C. 727 (1979), which held that ITT's acquisition of more than eighty percent of

1. The appellees from the Tax Court, at appeal No. 79–1985, successfully contested the following deficiencies:

| Docket No. | Party | Deficiency Assessment |
|---|---|---|
| 4953–74 | Arden S. and Sophia S. Heverly | $ 2,192.81 |
| 6153–74 | Edna L. Boyer, Deceased, represented by John H. Bozic, Jr., Executor | 13,202.00 |
| 6187–74 | Katherine D. Harvey | 41,454.28 |
| 8602–74 | John J. and Agnes C. DeFraine | 1,684.74 |

The appellee from the district court, John Lewis Pierson, at appeal No. 79–2192, recovered a judgment refunding $3,683 already paid plus statutory interest.

Hartford's stock in a single transaction satisfied the "solely for voting stock" requirement of clause B, regardless of the cash exchanges. *Id.* at 741–42. In an opinion announcing the decision of the court,[2] Judge Tannenwald began his analysis with an observation thàt the legislative history underlying § 368 is inconclusive on this issue. *Id.* at 732 (citing *Turnbow v. Commissioner,* 368 U.S. 337, 344 n.8, 82 S.Ct. 353, 357 n.8, 7 L.Ed.2d 326 (1961). He distinguished *Helvering v. Southwest Consolidated Corp.,* 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942), in which the Supreme Court held that an earlier version of the reorganization section dealing with both stock for stock and stock for asset exchanges allowed no consideration other than voting stock, because it involved an asset acquisition, not a stock acquisition. He also noted that *Southwest Consolidated* addressed a situation in which voting stock represented only sixty-three percent of the total consideration. 71 T.C. at 734–35.

Judge Tannenwald distinguished other decisions by grouping them into two categories. The first category included decisions in which the control requirement could be met only by taking into account prior acquisitions. In this category he grouped *Lutkins v. United States,* 312 F.2d 803, 160 Ct.Cl. 648, *cert. denied,* 375 U.S. 825, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963), *Commissioner v. Air Reduction Co.,* 130 F.2d 145 (2d Cir.), *cert. denied,* 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942), and *Pulfer v. Commissioner,* 43 B.T.A. 677 (1941), *aff'd* 128 F.2d 742 (6th Cir. 1942) (per curiam). 71 T.C. at 736. The second category of decisions involved single transactions in which more than eighty percent of the target corporation's stock was acquired but both voting stock and other consideration was used in the acquisition. 71 T.C. at 736. Included in this category were *Turnbow v. Commissioner,* 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326 (1961), *Mills v. Commissioner,* 39 T.C. 393 (1962), *rev'd,* 331 F.2d 321 (5th Cir. 1964),

and *Howard v. Commissioner,* 24 T.C. 792 (1955), *rev'd on other grounds,* 238 F.2d 943 (7th Cir. 1956). More specifically, "[i]n *Mills* and *Turnbow, each shareholder* whose stock was being acquired *got cash.*" 71 T.C. at 736. In addition, "*Howard* is factually distinguishable . . . because some stockholders involved in the one exchange transaction . . . received cash." *Id.* at 737. Judge Tannenwald concluded that neither category should apply to a situation in which ITT obtained "control" of Hartford by giving only ITT shares for Hartford shares in exchanges clearly separable from concurrent cash exchanges.

As support for his conclusion that clause B is undeserving of a "pervasively rigid interpretation," Judge Tannenwald noted that legislative amendments of clause B indicate a continuing congressional concern that courts were interpreting the "solely" requirement too rigidly and that the IRS had issued numerous rulings allowing technical exceptions to that requirement. *Id.* at 740. He also noted that a strict construction of "solely for . . . voting stock" would create such "odd results" as making some transactions that initially complied with clause B retroactively taxable if additional shares were acquired for nonstock consideration. *Id.* at 740–41. The court concluded:

> We are not unaware of the conceptual difficulties involved in determining what is "the acquisition" for purposes of a (B) reorganization and that an argument can be made that separating out the 1970 exchange begs the question, or to put it another way, assumes the issue which requires decision. But we do not see the situation in this light. The facts of the matter are that the 1970 exchange, standing by itself, satisfied in every way the literal requirements of section 368(a)(1)(B) and that neither legislative nor judicial history nor policy requires that that exchange (involving in excess of

**2.** Four judges joined the plurality opinion, two judges concurred in the result, and five judges dissented. *See* note 4, *infra.*

80 percent of Hartford's stock) not be separated from the other acquisitions of Hartford stock by ITT for cash, at least for the purpose of disposing of the legal issue raised by petitioners' second contention. We take this position with full knowledge that, for the purpose of disposing of that contention, on this motion for summary judgment, we must assume that the pre-1970 cash purchases were part of the "plan of reorganization." But our position, simply stated, is that, in the context of this case, such assumption is of no consequence because the prior purchases are irrelevant.

*Id.* at 741 (footnote omitted).[3] Two judges concurred and five judges dissented.[4] The Commissioner has appealed the Tax Court decision.[5]

### B.

The district court blazed a somewhat different trail. Judge Schwartz also concluded that prior decisions did not foreclose a result favorable to the taxpayers. He dealt at length with *Southwest Consolidated*, noting that it was decided under the Revenue Act of 1934, which treated stock acquisitions identically to asset acquisitions. 472 F.Supp. at 962. But subsequent changes in the reorganization statute have, he reasoned, destroyed that decision's precedential value. *Id.* at 963. The *Air Reduction* and *Howard* decisions, emphasizing the identity between stock and asset acquisitions, relied on *Southwest Consolidated* to disallow consideration other than voting stock in stock acquisitions. Judge Schwartz found *Air Reduction* unpersuasive because it failed to give a reasoned elaboration for its conclusion. 472 F.Supp. at 962–63. Although Judge Schwartz recognized that the ninth circuit had examined the legislative history of clause B in *Turnbow*, he noted that the court's inquiry did not determine whether "solely" permits consideration other than voting stock, "but rather was aimed at demonstrating that there was *some* limitation on the presence of boot." *Id.* at 965. Similarly, he noted that in *Mills v. Commissioner*, 331 F.2d 321 (5th Cir. 1964), the fifth circuit addressed an issue other than the "solely" requirement in concluding that

[3] Taxpayers reassert before us their argument, which the Tax Court accepted in the language quoted in text, that even if the cash purchases and the stock for stock exchange were part of the same "plan of reorganization," they were not part of the same "transaction" and thus deserve separate analysis under clause B. The majority of the tax court, two concurring judges and five dissenting judges, rejected this argument as a distinction without a difference. *See* 71 T.C. at 743 (Scott, J., concurring); *id.* at 744 (Quealy, J., dissenting); *id.* at 745 n.1, 749–51 (Wilbur, J., dissenting). We agree. To allow taxpayers to sever their acquisitions into separate "transactions" would lead far beyond the result taxpayers seek in this case, tax deferral when at least eighty percent of the target's stock is acquired for the acquiring corporation's stock. It would also render application of the "creeping control" amendment in clause B almost a matter of caprice: Some exchanges would be aggregated to allow deferral, while others would be severed to allow deferral. Recognition of such a distinction not only seems trivial, but would come at great cost to predictability in structuring transactions under clause B. Only through litigation could a corporation determine whether its exchanges would be aggregated or severed.

[4] Judge Scott, joined by Judge Irwin, concurred, arguing that the Tax Court's decision in

*Howard* was indistinguishable and should have been expressly overruled. 71 T.C. at 742–44. Judge Quealy's dissent rejected the plurality's "nebulous distinction" of prior decisions, and concluded that the law under clause B is too well settled to justify a change. 71 T.C. at 744. Judge Wilbur, joined by three other judges, relied on prior decisions in dissent, repudiating the distinctions used by the plurality. 71 T.C. at 745–49. He also emphasized the disadvantages of upsetting a settled interpretation of clause B, 71 T.C. at 749, and criticized the majority for implicitly separating the cash purchases from the stock for stock exchange, *id.* at 749–51. When the case was decided, the Tax Court had one vacancy due to the retirement of Judge Raum. Four judges, Judges Drennen, Fay, Goffe, and Hall, did not participate.

[5] The Commissioner has also appealed to three other courts of appeals: the first, fourth, and ninth. Those appeals are still pending. *Chapman v. Commissioner*, 618 F.2d 96 (1st Cir. 1979) (before Coffin, C.J., Bownes, J., and Clark, J.); *Reeves v. Commissioner*, No. 79–1438 (4th Cir., argued Feb. 6, 1980) (before Haynsworth, C. J., Bryan, J., and Russell, J.); *Coffen v. Commissioner, appeal docketed*, No. 79–7278 (9th Cir. June 18, 1979).

cash payments for fractional shares were not "consideration" in the sense prohibited by clause B. 472 F.Supp. at 965. Finally, he disapproved *Lutkins v. United States*, 312 F.2d 803, 160 Ct.Cl. 648, *cert. denied*, 375 U.S. 825, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963), because it relied entirely on *Southwest Consolidated* and *Howard* as the rationale for disallowing cash in a stock for stock exchange. 472 F.Supp. at 965–66. He interpreted the Supreme Court's decision in *Turnbow* as expressly reserving the issue. *Id.* at 966.

After concluding that no prior decisions were of precedential value, Judge Schwartz analyzed the legislative history of clause B. He noted that the ninth circuit's analysis of the legislative history in *Turnbow* hinged on its assumption that the amendment to clause C allowing some nonstock consideration in asset acquisitions necessarily implied an intent not to allow other consideration in stock acquisitions. He rejected this assumption, however, because Congress may have been unaware of a settled judicial interpretation of clause B when it amended clause C. Instead of relying on specific citations to the legislative history, he relied on the "principal policy underlying the statutory scheme—that of facilitating corporate reorganizations," and noted that allowing some consideration other than voting stock in clause B reorganizations would be advantageous in effecting reorganizations. *Id.* at 973. He also analogized clause B to clause C, noting that "[i]f Congress was content to permit up to twenty percent boot in a (C) reorganization, it must be assumed *a fortiori* that an equivalent amount of boot was permissible in a (B) reorganization, absent a clear rule to the contrary of which Congress must have been aware." *Id.* at 973 (footnote omitted). Finally Judge Schwartz reasoned that allowing consideration other than voting stock under clause B would, in view of the "creeping control" amendment to clause B in the 1954 Code, create a "well-ordered universe" in the reorganization sections of the Internal Revenue Code. *Id.* at 974 (quoting Merritt, *Tax-Free Corporate Acquisitions—The Law and the Proposed Regulations*, 53 Mich.L.Rev. 911, 933

(1955)). These considerations, he concluded, dictated a construction of clause B that allows up to twenty percent nonstock consideration so long as the acquiring corporation acquires at least eighty percent of the target corporation's stock solely for its own voting stock.

## III.

After a detailed review of prior decisions, the legislative history, and the policies underlying the reorganization section, we conclude that the interpretation urged by the Commissioner is essentially correct. At the outset, we emphasize the burden the taxpayers must shoulder in overturning a construction of the statute that has prevailed in both judicial opinions and tax planning for almost fifty years. Were we clearly convinced that this prevailing interpretation is incorrect, we would not hesitate to adopt the construction advocated by the taxpayers. But their argument, under close examination, implicitly assumes that the prevailing statutory construction is so irrational that the Commissioner must affirmatively justify it. Not only do we disagree with the assumption that disallowing nonstock consideration under clause B is irrational, but we note that the taxpayers have subtly attempted to shift their burden of overturning a settled construction of the statute back to the Commissioner. Quite apart from the reasons below, which indicate that consideration other than voting stock has no place in stock for stock acquisitions, we fundamentally disagree with taxpayers' implicit assumption that the settled construction of the statute, in an area in which stability is of considerable importance, should be accorded little or no deference.

## IV.

Because this case presents an issue of statutory construction, "the 'starting point' must be the language of the statute itself." *Lewis v. United States*, —— U.S. ——, ——, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980) (citations omitted); *see also United States v. DiSantillo*, 615 F.2d 128 at

134 (3d Cir. 1980). Under the statutory schema, the general rule is that any gain[6] on the sale or exchange of property must be recognized. At the time of the transactions under consideration here, this rule appeared in § 1002 of the Internal Revenue Code, 26 U.S.C. § 1002: "Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized." Taxpayers argue that their exchanges are within an explpcit exception to § 1002. however, because § 354(a) of the Code provides that "[n]o gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of a plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization." If a valid reorganization occurs, any consideration other than stock or securities received by shareholders is subject to recognition in the amount of the gain realized, but the gain recognized will not exceed the amount of nonstock consideration received. § 356(a) of the Internal Revenue Code, 26 U.S.C. § 356(a). *See Turnbow v. Commissioner,* 368 U.S. 337, 344, 82 S.Ct. 353, 357, 7 L.Ed.2d 326 (1961).

The linchpin of taxpayers' argument, therefore, is that the acquisition of Hartford stock by ITT was a valid reorganization as defined in § 368(a)(1) of the Code, 26 U.S.C. § 368(a)(1). Specifically, they rely on clause B, which defines a reorganization as

the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of

such other corporation (whether or not such acquiring corporation had control immediately before the acquisition) . . .

§ 368(a)(1)(B) of the Internal Revenue Code, 26 U.S.C. § 368(a)(1)(B). The section defines "control" as "the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." *Id.* at § 368(c). The parties agree that ITT obtained the requisite amount of Hartford stock to achieve "control" under this definition. They also agree that if the transaction satisfies clause B, the taxpayers received stock from a "party to a reorganization" in exchange for their stock in a "party to a reorganization." *See id.* at § 368(b). Thus, the dispute centers on the language in clause B requiring that one corporation acquire "in exchange solely for all or a part of its voting stock . . . stock of anothzr corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation . . ."

Taxpayers argue that the acquiring corporation must obtain "control" of the target corporation "solely for . . . voting stock," and that consideration other than voting stock is permissible under clause B if this precondition is met. The Commissioner disagrees, arguing that the acquiring corporation must obtain "control" in a transaction in which it exchanges voting stock and no other consideration. We conclude that no clear resolution of these competing arguments is apparent on the face of the statute. We must therefore analyze the widest range of available materials to derive an answer. This perforce makes our task exhaustive and requires an opinion that is more lengthy than we would prefer. But this task is necessary here because, as a reviewing court, we must examine and

---

**6.** At the time of the exchanges, "gain" was defined in § 1001. Section 1001(c) referred to § 1002 for the general rule regarding recognition of gain. Section 1001 was amended in 1976 to incorporate § 1002 into § 1001(c), which now states: "Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized." 26 U.S.C. § 1001(c). This change in the placement of the recognition requirement has effected no substantive change.

evaluate prior judicial constructions, the legislative history, the policies represented by each term in the statute, and the relationship of clause B to the overall statutory schema.

## V.

Our analysis of the judicial history of clause B must begin with the Supreme Court's decision in *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942). That case arose under § 112(g)(1) of the Revenue Act of 1934, 48 Stat. 680, 705, the relevant portion of which stated:

> (1) The term "reorganization" means . . . (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation.

*See* 315 U.S. at 196, 62 S.Ct. at 548. It bears emphasis that the 1934 Act combined both assets acquisitions, now in clause C, and stock acquisitions, now in clause B, in one clause, treating them identically. The district court recognized this identical treatment. 472 F.Supp. at 962.

In *Southwest Consolidated*, the creditors of Southwest Gas Utilities Corporation had reorganized it under a plan approved by the Delaware chancery court to assure optimal payment of their claims. They formed a new corporation, Southwest Consolidated, to which the assets of the old corporation were transferred for a package of 49,300 shares of common stock, 2,760 Class A warrants, 18,445 Class B warrants, and a cash payment directly to non-participating security holders of $106,680. The fair market value of the assets at the time of the exchange was $1,766,694.98. The controversy arose when the new corporation tried to use the old corporation's basis in the assets, about $9,000,000, to compute gains and losses. The Court held that the transfer of assets had been a recognition transaction outside the reorganization definition in

§ 112(g)(1)(B), thereby precluding use of the higher carry-over basis of the old corporation. 315 U.S. at 199, 62 S.Ct. at 550.

## A.

The proper interpretation of *Southwest Consolidated* has caused great controversy between the parties in this case. Taxpayers distinguish it in two ways, arguing first that it involved an assets acquisition, not a stock acquisition. They argue second that the holding of the decision is that thirty-seven percent nonstock consideration coupled with sixty-three percent stock consideration fails to qualify as a stock for assets acquisition. ITT, they emphasize, acquired only eight percent of Hartford's stock for nonstock consideration, much less than the thirty-seven percent involved in *Southwest Consolidated*. The Commissioner relies primarily on the Court's statement that "Congress has provided that the assets of the transferor corporation must be acquired in exchange 'solely' for 'voting stock' of the transferee. *'Solely' leaves no leeway.* Voting stock plus some other consideration does not meet the statutory requirement." 315 U.S. at 198, 62 S.Ct. at 550 (emphasis added). We agree with the Commissioner's interpretation, although we will respond more directly to the arguments presented by taxpayers.

### 1.

The Court's decision in *Southwest Consolidated* is relevant to this case even though it involved an asset acquisition. The statute it was construing, the Revenue Act of 1934, treated asset and stock acquisitions identically. Even though subsequent amendments to both clauses have indicated congressional recognition of important differences between asset and stock acquisitions, no such recognition was present in the 1934 Act, and we conclude that the Court's construction of the solely for voting stock requirement for assets acquisitions was equally applicable to stock for stock transactions. There was no explicit statutory distinction *ipsissimis verbis*, and we find no express language in the Court's opinion suggesting the presence of one. In

addition, the taxpayers' argument with respect to *Southwest Consolidated* is somewhat disingenuous: They distinguish the leading Supreme Court decision on the solely for voting stock requirement because it was an asset acquisition case, even though at that time, in 1942, both stock and assets acquisitions were treated identically. Yet later, in an attempt to incorporate the apparently greater flexibility of the present version of clause C into clause B, they argue that Congress in 1954 could have intended no difference between the two transactions when it amended clause C but failed to amend clause B. We refuse to accept this best-of-both-worlds interpretation, and conclude that at the time it was decided, *Southwest Consolidated* served as the authoritative construction of statutory language describing both stock and assets acquisitions.

### 2.

The second distinction urged by taxpayers concerns the amount of nonstock consideration involved in *Southwest Consolidated.* Beginning with the total asset value of $1,766,695, they compute the nonstock consideration as follows:

| | |
|---|---:|
| Cash | $106,680 |
| 2,760 Class A warrants at $29 | 80,040 |
| 18,445 Class B warrants at $25 | 461,125 |
| | $647,845 |

*See Reeves v. Commissioner,* 71 T.C. at 735 n.8. The ratio of nonstock to total consideration was thirty-seven percent. Thus, by combining the cash transferred, about six percent of the total consideration, with the stock warrants, about thirty percent of the total consideration, taxpayers conclude that *Southwest Consolidated* dealt with such an extreme situation that it is of little value in

a close case such as this. But there is no indication in the Court's opinion that it was influenced by the *combined* value of the nonstock consideration. Indeed, the Court dealt with the cash and the warrants separately, arguably in the form of alternative rationales.[7] *See* 315 U.S. at 199–201, 62 S.Ct. at 550–551. With respect to the six percent cash exchanged the Court emphasized that

> [t]he rights of the security holders against the old corporation were drastically altered by the sale made pursuant to the plan. The sale not only removed the lien from the property and altered the rights of security holders in it; it also limited and defined the rights of the individual creditors if they elected to take cash rather than participate in the plan.

*Id.* at 199, 62 S.Ct. at 550 (citation omitted); *see also id.* at 200, 62 S.Ct. at 550. The Court also emphasized the devastating effect of the warrants on the transaction. *See id.* at 201, 62 S.Ct. at 551.

But most persuasive in response to the taxpayer's second argument is the Court's clear statement that " '[s]olely' leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement." *Id.* at 198, 62 S.Ct. at 550 (citation omitted). Although a large amount of nonstock consideration was at issue in *Southwest Consolidated,* the precept announced by the court was much more inclusive. In Pound's trichotomy,[8] the Court *interpreted* the statutory precept as "leav[ing] no leeway." It then *applied* that precept to the specific facts, which, as taxpayers note, clearly dictated the Court's result. We cannot disregard either step as unnecessary to the decision.

---

7. The Tax Court itself has deemed them alternative rationales, explaining in *Mills v. Commissioner,* 39 T.C. 393, 398 (1962), *rev'd on other grounds,* 331 F.2d 321 (5th Cir. 1964): "The Supreme Court held that the $106,680 was other consideration and *alternatively* that certain warrants issued were also not voting stock." (emphasis added).

8. Dean Pound wrote:

> Supposing the facts to have been ascertained, decision of a controversy according to law involves (1) selection of the legal material on which to ground the decision, or as we commonly say, finding the law; (2) development of the grounds of decision from the material selected, or interpretation in the stricter sense of that term; (3) application of the abstract grounds of decision to the facts of the case.

Pound, *The Theory of Judicial Decision,* 36 Harv.L.Rev. 940, 945 (1923).

### B.

Other decisions relevant to this issue are not controlling precedents in this circuit, but are influential to the extent that their reasoning is persuasive. Unfortunately, few courts have fortified their conclusions on this troublesome issue with a reasoned elaboration. Several courts rely exclusively on *Southwest Consolidated. See Commissioner v. Air Reduction Co.*, 130 F.2d 145, 148 (2d Cir.), *cert. denied*, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942); *Howard v. Commissioner*, 24 T.C. 792, 804 (1955), *rev'd on other grounds*, 238 F.2d 943 (7th Cir. 1956); *Howard v. Commissioner*, 238 F.2d 943, 946–47 (7th Cir. 1956) (citing legislative history to establish that acquisitions of stock and acquisitions of assets were intended to be treated alike, and then relying on *Air Reduction*); *Lutkins v. United States*, 312 F.2d 803, 805, 160 Ct.Cl. 648, *cert. denied*, 375 U.S. 825, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963); *cf. Mills v. Commissioner*, 39 T.C. 393, 400 (1962) (relying on *Southwest Consolidated* in strictly construing "solely" and holding that no *de minimis* rule applies under clause B), *rev'd* 331 F.2d 321, 323 (5th Cir. 1964) (Maris, J., sitting by designation) (citing *Southwest Consolidated* to demonstrate that no consideration other than voting stock is allowable under clause B but concluding that cash payments for fractional shares are not "consideration" for purposes of the "solely for . . . voting stock" requirement).

In *Commissioner v. Turnbow*, 286 F.2d 669 (9th Cir. 1960), *aff'd in part*, 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326 (1961), the ninth circuit examined the legislative history behind clause B. It found that Congress had added the solely for voting stock requirement, as an alternative to complete

elimination of these types of reorganizations, to preclude tax deferred treatment for transactions that were actually sales but that were structured as reorganizations. 286 F.2d at 673. Quoting the Senate Finance Committee Report, S.Rep. No. 558, 73d Cong., 2d Sess. 17 (1934), *reprinted in* 1939–1 C.B. (pt. 2) 586, 598–99,[9] which accompanied the Revenue Act of 1934, the court concluded that the congressional purpose could best be effected by allowing no nonstock consideration under clause B. The court also noted that a construction of clause B allowing nonstock consideration so long as eighty percent of the target corporation's stock was acquired solely for stock would render a subsequent amendment to clause C superfluous. *See* § 368(a)(2)(B) of the Internal Revenue Code, 26 U.S.C. § 368(a)(2)(B).[10] That amendment allowed, within strict limits, consideration other than voting stock in clause C transactions. If the language in clause B could be interpreted to allow nonstock consideration, the court reasoned, the identical language in clause C could be similarly interpreted. Because that interpretation of clause B would have rendered the amendment to clause C unnecessary, the court concluded that the effort of Congress in amending clause C demonstrates that clause B does not allow nonstock consideration. 286 F.2d at 674.[11]

Taxpayers question the *Turnbow* decision, arguing that it assumes improperly that Congress intended clause B to allow only voting stock as consideration. By structuring its analysis around subsequent amendments to clause C, which had already been construed in *Southwest Consolidated*, and then comparing clause B, which had not been authoritatively construed at the time of the 1954 amendment,[12] the ninth circuit, according to the taxpayers, "begged the question." Equally probable, they contend,

---

9. It will be noted that the proposed amendment requires that * * * the acquisition, whether of stock or of substantially all the properties, must be in exchange solely for the voting stock of the acquiring corporation. 286 F.2d at 673 (quoting S.Rep. No. 558, 73d Cong., 2d Sess. 17 (1934), *reprinted in* 1939–1 C.B. (pt.2) 586, 598–99).

10. Section 368(a)(2)(B) appears in note 25 *infra*.

11. When the Supreme Court affirmed the ninth circuit's decision in *Turnbow*, the parties assumed the validity of the ninth circuit's decision that nonstock consideration is impermissible under clause B. *See* 368 U.S. at 341, 82 S.Ct. at 355.

12. Taxpayers' analysis assumes that Congress was unaware of, or implicitly disapproved of,

is a congressional intent to amend clause C to conform it to clause B. We have no small difficulty with taxpayers' indictment of *Turnbow*, because they rely on the dissimilarity of clauses B and C to distinguish *Southwest Consolidated*, but emphasize a latent congressional purpose to keep them identical through the amendments to clause C. Nevertheless, we will not rest our analysis totally on either the ninth circuit decision in *Turnbow* or the Supreme Court's decision in *Southwest Consolidated*. We turn to our own independent analysis of the legislative history.

## VI.

The reorganization provisions of the Internal Revenue Code have developed over the lifetime of the Code as Congress made revisions to accommodate legitimate business needs. Provision for deferred tax treatment of reorganizations first appeared in the Revenue Act of 1918, c. 18, 40 Stat. 1057, 1060, § 202(b), which stated in relevant part:

[W]hen in connection with reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged.

*See* H.R.Rep. No. 1037, 65th Cong., 2d Sess. 44–45 (1918), *reprinted in* 1939–1 C.B. (pt. 2) 130, 132. In 1921, Congress replaced this section with a more sophisticated treatment,[13] but retained the requirement that the shareholders in the reorganization exchange receive "in place of any stock or securities owned by [them], stock or securities in a corporation a party to or resulting from such reorganization." § 202(c)(2) of the Revenue Act of 1921, c. 136, 42 Stat. 230. The Conference Report to the House, H.R.Rep. No. 486, 67th Cong., 1st Sess. 17 (1921), *reprinted in* 1939–1 C.B. (pt. 2) 206, 209, noted that the Act "provides that the property exchanged shall consist only of stock or securities . . . ."

When Congress amended the reorganization provisions in 1924,[14] the statute became amenable to undesirable interpretation. Although Congress intended no radical change in meaning from the prior Act,[15] *see*

the decision in *Commissioner v. Air Reduction*, 130 F.2d 145 (2d Cir.), *cert. denied*, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942).

13. The relevant portion of the Act provided: [e]ven if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized—

. . . . .

(2) When in the reorganization of one or more corporations a person receives in place of any stock or securities owned by him, stock or securities in a corporation a party to or resulting from such reorganization. The word "reorganization," as used in this paragraph, includes a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or of substantially all the properties of another corporation), recapitalization, or mere change in identity, form, or place of organization of a corporation, . . . .

Revenue Act of 1921, c. 136, 42 Stat. 227, 230, § 202(c).

14. Section 203(h)(1) of the Revenue Act of 1924, c. 234, 43 Stat. 253, 257, § 203(h)(1), stated:

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

15. The Senate amended the House version

to include within its terms the case of a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders, or both, are in control of the corporation to which the assets are transferred. This is a common type of reorganization, and clearly should be included within the reorganization provisions of the statute.

S.Rep. No. 398, 68th Cong., 1st Sess. 17 (1924), *reprinted in* 1939–1 C.B. (pt. 2) 266, 278. The change was reflected in 203(h)(1)(B) of the statute. *See* note 14 *supra*.

H.R.Rep. No. 179, 68th Cong., 1st Sess. 13 (1924), *reprinted in* 1939–1 C.B. (pt. 2) 241, 251, it soon realized that the change had enhanced the prospects for tax avoidance. By 1934,[16] Congress had become concerned that the reorganization provisions were being abused. The House Report on the 1934 Act illustrates this concern:

> The reorganization provisions have been in effect for many years, having been adopted in substantially their present form in 1924. They state in detail how each step of a reorganization should be treated for tax purposes. The policy was adopted of permitting reorganizations to take a wide variety of forms, without income-tax liability. As a result, astute lawyers frequently attempted, especially during the prosperous years, to take advantage of these provisions by arranging in the technical form of a reorganization, within the statutory definition, what were really sales.

> .   .   .   .   .

> [T]he definition of a reorganization has been restricted so that the definition will conform more closely to the general requirements of corporation law, and will limit reorganizations to (1) statutory mergers and consolidations; (2) transfers to a controlled corporation, "control" being defined as an 80 per-cent ownership; and (3) changes in the capital structure or form of organization.

> By these limitations the committee believes that it has removed the danger that taxable sales can be cast into the form of a reorganization, while at the same time, legitimate reorganizations, required in order to strengthen the financial condition of the corporation, will be permitted. Furthermore, the retention of the other reorganization provisions will prevent large losses from being established by bondholders and stockholders who receive securities in a newly reorganized enterprise which are substantially the same as their original investments.

H.R.Rep. No. 704, 73d Cong., 2d Sess. 14 (1934), *reprinted in* 1939–1 C.B. (pt. 2) 554, 564. Though sympathetic to the concern about tax avoidance, the Senate restored the stock and assets acquisition provisions with a significant modification:

> Your committee is in complete agreement with the purposes of the House bill which aim at tax-avoidance schemes in this connection. However, some modifications are recommended in order to bring about a more uniform application of the provisions in all 48 of the States. Not all of the States have adopted statutes providing for mergers or consolidations; and, moreover, a corporation of one State cannot ordinarily merge with a corporation of another State. The committee believes that it is desirable to permit reorganizations in such cases, with restrictions designed to prevent tax avoidance. Consequently, the committee recommends the insertion in the House bill of an addition to the definition of the term "reorganization" as follows:

>> (B) the acquisition by one corporation in exchange solely for its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation;

> The committee believes that these transactions, when carried out as prescribed in this amendment, are in themselves sufficiently similar to mergers and consolidations as to be entitled to similar treatment. It will be noted that the proposed amendment requires that (1) the

---

**16.** The Senate proposed an amendment in the Revenue Act of 1926 that would have allowed a corporation owning at least a majority of the voting stock and at least a majority of the total numbers of shares of all other classes of stock of another corporation to distribute that stock to its own shareholders without requiring the recipients of the stock to recognize gain. "This is done on the theory that there is no actual income to the distributee until he sells the stock since his interest in the assets is exactly the same as it was before." S.Rep. No. 52, 69th Cong., 1st Sess. 16 (1926), *reprinted in* 1939–1 C.B. (pt. 2) 332, 345. The amendment failed. H.R.Rep. No. 356, 69th Cong., 1st Sess. 30–31 (1926), *reprinted in* 1939–1 C.B. (pt. 2) 361, 362 (House conference report). The failure of this amendment demonstrates the importance of a reorganization transaction to the statutory schema providing tax deferral.

acquiring corporation must obtain at least 80 per cent of the voting stock and at least 80 per cent of the total number of shares of all other classes of stock of the other corporation, instead of only a majority as provided by the present law; and (2) the acquisition, whether of stock or of substantially all the properties, must be in exchange solely for the voting stock of the acquiring corporation.

Your committee approves the retention of the exchange and reorganization provisions with these changes.

S.Rep. No. 558, 73d Cong., 2d Sess. 16–17 (1934), *reprinted in* 1939–1 C.B. (pt. 2) 586, 598–99. The House acceded to the Senate provision. H.R.Rep. No. 1385, 73d Cong., 2d Sess. 21–22 (1934), *reprinted in* 1939–1 C.B. (pt. 2) 627, 632 (House conference report). This version of the statute was before the Supreme Court in *Southwest Consolidated.*

Congress amended the reorganization section in the Revenue Act of 1939 by separating the treatment of stock and asset acquisitions, placing them in clause B and clause C respectively.[17] In explaining a change in the assets acquisition definition that allowed the acquiring corporation to assume the transferor's liabilities, thereby overruling *United States v. Hendler*, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018 (1938), the House Report stated:

> The definition of "reorganization" as contained in section 112(g)(1) of the Internal Revenue Code is amended by section 213(b) of the bill. Clause (B) of this definition now provides that in order for the transaction to constitute a reorganization, the acquisition of properties therein described must be in exchange *solely* for voting stock. Section 213(b) provides

that if the corporation acquiring the properties assumes liabilities of the party from whom the properties are acquired, or takes the property subject to a liability, such assumption of liabilities, or taking subject to a liability, shall be disregarded in determining whether the properties are received in exchange solely for voting stock.

H.R.Rep. No. 855, 76th Cong., 1st Sess. 19 (1939), *reprinted in* 1939–2 C.B. 504, 519. As noted earlier with respect to the *Southwest Consolidated* decision, stock and assets acquisitions had been treated identically in the 1934 Act. Thus, when Congress stated in the House Report that "for the transaction to constitute a reorganization, the acquisition of properties therein described must be in exchange *solely* for voting stock," it was inferentially referring to stock acquisitions as well. We deem the report's emphasis of "solely" to be significant evidence of congressional understanding of this section.

In 1954, Congress amended clause B to eliminate uncertainty about "creeping acquisitions." Before the amendment, a corporation that had previously acquired stock of the target corporation could not avail itself of clause B if it owned more than twenty percent of the target's stock. The amendment corrected this problem by requiring the acquiring corporation to hold control "immediately after the acquisition," "whether or not [it] had control immediately before the acquisition." Internal Revenue Code of 1954, Pub.L. No. 83–591, 68A Stat. 1, 120, § 368(a)(1)(B). *See* S.Rep. No. 1622, 83d Cong., 2d Sess. 273 (1954), *reprinted in* [1954] U.S.Code Cong. & Admin.News 4621, 4911.[18] In 1964, Congress again

---

**17.** As amended, § 112(g)(1) stated in relevant part:

> (1) The term "reorganization" means . . (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, *of at least 80 per centum of the voting* stock and at least 80 per cent of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the

acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, . . . Revenue Act of 1939, c. 247, 53 Stat. 862, 870, § 213(b).

**18.** Taxpayers rely heavily on the Senate Report's statement that "[u]nder section 112(g)(1)(B), of existing law, one corporation can acquire *enough stock* of another to get control of the second corporation solely for its own voting stock tax free." S.Rep. No. 1622, 83d Cong., 2d Sess. 273, *reprinted in* [1954] U.S.Code Cong. & Admin.News 4621, 4911

amended clause B to allow the acquiring corporation to use either its own stock, or the stock of a corporation controlling it, in exchange for the target corporation's stock. Revenue Act of 1964, Pub.L. No. 88–272, 78 Stat. 19, 57, § 218(a). Neither the legislative history of the 1954 amendment, nor that of the 1964 amendment, is directly helpful in addressing the issue before us. See S.Rep. No. 830, 88th Cong., 2d Sess. (pt. 2) 227 (1964), reprinted in [1964] U.S.Code Cong. & Admin.News 1868, 1898.[19]

This review of the legislative history fails to provide a conclusive answer to the question presented in this case. Nevertheless, we deem several developments influential to and supportive of our ultimate decision. First, as originally enacted in 1918, the provisions dealt exclusively with the receipt by shareholders of stock or securities for their own stock or securities. Congress altered this treatment in 1924 by removing the explicit requirement that the exchange involve only stock or securities, but later realized allowing other consideration had promoted tax avoidance. Thus, in 1934 Congress added the "solely for . . . voting stock" requirement, and has retained it until the present day without relevant modification to clause B. We construe this action in adding and retaining the voting stock requirement as a conscious decision by Congress to foreclose other consideration.

In addition, when Congress legislatively overruled the Hendler decision by amending clause C in 1939, it recognized that asset acquisitions, which were being separated from stock acquisitions for the first time, allowed only exchanges "solely for voting stock." We think the simultaneous separation of the transactions and amendment of the asset acquisition provision, without altering the stock acquisition provision, demonstrates congressional recognition of differences between the two transactions. It also indicates, though perhaps not conclusively, an intent to leave the "solely for voting stock" language unaffected as it applied to stock acquisitions.

Finally, the rather frequent amendments to the reorganizations provisions imply close congressional supervision and awareness of their use and abuse. This close supervision makes us even more wary of taxpayers' assertion of "implicit" amendments to clause B by amending clause C.

We now examine the policies at work in the reorganization provisions in an attempt to effectuate a rational operation of the schema.

### VII.

Taxpayers submit essentially two policy arguments supporting their construction of clause B. First, they argue that the voting stock requirement appears in the statute to

(emphasis added). The amendment allowing "creeping control" centered on corporations already owning over twenty percent of the target's stock, and that were thus unable to acquire the requisite amount of stock ("enough stock") for control. In this context, we do not read the statement as support for taxpayers' argument that only eighty percent of the stock acquired must be acquired for voting stock; Congress instead was emphasizing that less than eighty percent was available for the acquiring corporation to acquire.

**19.** Taxpayers isolate a statement in the legislative history of the 1964 Act as support for their argument, considered below, that clause B should be treated like clause C insofar as non-stock consideration is concerned:

[T]he 1954 code permits tax-free reorganizations in the case of the exchange of the parent's stock for the assets of a corporation

acquired by the subsidiary. However, a similar result is denied where the subsidiary acquires the stock of the other corporation in exchange for the stock of its parent corporation. Since Congress has considered the "continuity of interest" rule satisfied in the case of asset acquisitions, there seems to be no reason for not applying the same rule to stock acquisitions, since there is little in substance to distinguish an asset acquisition from a stock acquisition.

S.Rep. No. 830, 88th Cong., 2d Sess. (pt. 1) 83, reprinted in [1964] U.S.Code Cong. & Admin. News 1673, 1755. That Congress found "little in substance to distinguish an asset acquisition from a stock acquisition" for purposes of allowing an acquiring corporation to use its parent corporation's stock does not imply that no differences exist for purposes of allowing non-stock consideration. See pages 1243–1245 infra.

assure a "continuity of interest" between the pretransaction equity holders of the target corporation and the post-transaction equity holders. Sufficient continuity of interest is retained, they argue, if voting stock of the acquiring corporation is exchanged for a control, or eighty percent, block of the target corporation's stock. They conclude that the voting stock requirement and the control requirement are interrelated, in effect meaning that an acquisition, solely for voting stock, of control of the target corporation is within clause B.

Their second argument is that clause B, under the construction urged by the Commissioner, fails to conform to the general legislative schema. Taxpayers note that in both clause A and clause C reorganizations, Congress and the courts have allowed certain amounts of nonstock consideration. To disallow consideration other than voting stock in clause B, they argue, would impose a degree of inflexibility on stock for stock transactions that is totally unjustified in view of congressional intent to make the other reorganization provisions flexible. They conclude that this court should not adopt a construction that would impute such an allegedly irrational result to Congress.

■ We must analyze these arguments cognizant that Congress has provided tax deferral for reorganizations as a matter of legislative grace, and that strict compliance with the statute is necessary regardless of our agreement or disagreement with the conditions imposed. *See Lutkins v. United States*, 312 F.2d 803, 805, 160 Ct.Cl. 648, *cert. denied*, 375 U.S. 825, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963). As Justice Harlan wrote for the Court in *Commissioner v. Gordon*, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968):

Section 355 provides that certain distributions of securities of corporations controlled by the distributing corporation do not result in recognized gain or loss to the distributee shareholders. The requirements of the section are detailed and specific, and must be applied with precision. It is no doubt true, as the Second Circuit emphasized, that the general purpose of the section was to distinguish corporate fission from the distribution of earnings and profits. However, although a court may have reference to this purpose when there is a genuine question as to the meaning of one of the requirements Congress has imposed, a court is not free to disregard requirements simply because it considers them redundant or unsuited to achieving the general purpose in a particular case. Congress has abundant power to provide that a corporation wishing to spin off a subsidiary must, however bona fide its intentions, conform the details of a distribution to a particular set of rules.

*Id.* at 91–94, 88 S.Ct. at 1522–1523 (footnote omitted). Thus, although Congress may have engaged in legislative overkill to meet potential exigencies, we as a court must be reluctant to impose our own standards of strict rationality onto the statutory schema.

## A.

■ Although we agree that the continuity of interest doctrine is reflected in the voting stock requirement of clause B, we do not agree that a necessary relationship must exist between that requirement and the control requirement. The continuity of interest requirement is of judicial origin and applies throughout the reorganization provisions. One of the first statements of the doctrine was by Judge Augustus Hand in *Cortland Specialty Co. v. Commissioner*, 60 F.2d 937 (2d Cir. 1932), a case arising under the 1926 Act and involving a transfer of assets from one corporation to another in exchange for cash and notes. *Id.* at 938. Although the acquisition of assets provision of the 1926 Act did not explicitly impose a voting stock requirement, the court noted that "[r]eorganization, merger, and consolidation are words indicating corporate readjustments of existing interests. They all differ fundamentally from a sale where the vendor corporation parts with its interest for cash and receives nothing more." *Id.* at 939. In specific application to the reorganization statute, Judge Hand explained:

When describing the kind of change in corporate structure that permits exemption from these taxes, section 203 does

not disregard the necessity of continuity of interests under modified corporate forms. Such is the purpose of the word "reorganization" in section 203(b)(3) of the act. 26 U.S.C.A. § 934(b)(3), where a corporation exchanges its property "solely for stock or securities." Such also is the nature of the "merger or consolidation" described in subdivision (h)(1)(A) where a corporation acquires a majority of the stock of another, and such is the nature of the "reorganization" described in subdivision (h)(1)(B) of section 203, 26 U.S.C.A. § 934(h)(1)(B), where a corporation transfers assets to another corporation, and the transferor, or its stockholders, immediately thereafter are in control of the transferee. The words "A recapitalization," in subdivision (h)(1)(C) of section 203, 26 U.S.C.A. § 934(h)(1)(C), and "A mere change in * * * form * * * of organization, however effected," in subdivision (h)(1)(D) of section 203, 26 U.S.C.A. § 934(h)(1)(D), involve the same idea.

When subdivision (h)(1)(A) included in its definition of "merger or consolidation" the "acquisition by one corporation of * * * substantially all the properties of another," it did this so that the receipt of property by the corporation surviving the merger might serve to effect a reorganization as does an acquisition of stock. Each transaction presupposed a continuance of interest on the part of the transferor in the properties transferred. Such a limitation inheres in the conventional meaning of "merger and consolidation," and is implicit in almost every line of section 203 which we have quoted.

60 F.2d at 940. The Supreme Court adopted Judge Hand's analysis in *Pinellas Ice Co. v. Commissioner,* 287 U.S. 462, 470, 53 S.Ct. 257, 260, 77 L.Ed. 428 (1933), and applied it in several cases thereafter. *See, e. g., Helvering v. Alabama Asphaltic Limestone Co.,* 315 U.S. 179, 182–83, 62 S.Ct. 540, 542–43, 86 L.Ed. 775 (1942); *LeTulle v. Scofield,* 308

U.S. 415, 420, 60 S.Ct. 313, 315, 84 L.Ed. 355 (1940); *Groman v. Commissioner,* 302 U.S. 82, 89, 58 S.Ct. 108, 112, 82 L.Ed. 63 (1937); *Helvering v. Minnesota Tea Co.,* 296 U.S. 378, 385, 56 S.Ct. 269, 272, 80 L.Ed. 284 (1935); *John A. Nelson Co. v. Helvering,* 296 U.S. 374, 377, 56 S.Ct. 273, 274, 80 L.Ed. 391 (1935). In a case involving a statutory merger and arising under the Revenue Act of 1938, this court applied the doctrine to disallow tax deferral even though the literal terms of the reorganization provisions had been met. *Roebling v. Commissioner,* 143 F.2d 810, 812 (3d Cir.), *cert. denied,* 323 U.S. 773, 65 S.Ct. 131, 89 L.Ed. 618 (1944). When it added the solely for voting stock requirement in the 1934 Act, Congress recognized the developing case law in this area and approved it.

> The courts have shown a commendable tendency to look through the mere form of the transaction into its substance. The Supreme Court has indicated that the broad principle underlying these sections is that no taxable profit is realized from a reorganization, if no money passes and if the changes in corporate organization are essentially changes only in form, with the stockholders continuing their former interest in the original enterprise.

H.R.Rep. No. 704, 73d Cong., 2d Sess. 13 (1934), *reprinted in* 1939–1 C.B. (pt. 2) 554, 564.[20] In *Southwest Consolidated* the Supreme Court recognized that, with the addition of the solely for voting stock language, "[t]he continuity of interest test is made much stricter." 315 U.S. at 198, 62 S.Ct. at 550. In addition, under acts prior to that passed in 1934, courts had held that long term bonds and preferred stock, not just voting stock, satisfied the continuity of interest requirement. *See John A. Nelson Co. v. Helvering,* 296 U.S. 374, 377, 56 S.Ct. 273, 274, 80 L.Ed. 391 (1935) (preferred stock and cash for assets); *Scofield v. LeTulle,* 103 F.2d 20, 21–22 (5th Cir. 1939) (long term bonds), *rev'd on this issue,* 308 U.S. 415, 420–21, 60 S.Ct. 313, 315–16, 84

---

**20.** The House Report on the 1934 Act recommended elimination of the stock and assets acquisition provisions, and the Senate added the voting stock requirement. The Senate, however, added the requirement in response to

what it felt were the legitimate concerns of the House. S.Rep.No. 558, 73d Cong., 2d Sess. 16–17 (1934), *reprinted in* 1939–1 C.B. (pt. 2) 586, 598–99.

L.Ed. 355 (1940). Although Congress ratified the continuity of interest doctrine, it tightened it by disallowing nonvoting stock and bonds and by raising the level of continuity required. We conclude that the requirement in clause B that the exchange be solely for voting stock incorporates the continuity of interest doctrine, an important aspect of any tax deferred reorganization.

Our disagreement with taxpayers lies in our perception of the policy promoted by the control requirement. "Control," we think, is important to another aspect of a reorganization, the requirement that the corporation undergo some change in form or structure. As the second circuit noted in *Cortland Specialty Co. v. Commissioner*, 60 F.2d at 940, "[r]eorganization presupposes continuance of business under *modified corporate forms*," (emphasis added); *cf. Scofield v. San Antonio Transit Co.*, 219 F.2d 149, 154 (5th Cir.) (corporate shell from which creditors had removed all assets "could not be recast into a new and modified form in the sense contemplated" by the asset acquisition provision), *cert. denied*, 350 U.S. 823, 76 S.Ct. 50, 100 L.Ed. 735 (1955).

As an example of the importance the control requirement carries, we note that had ITT acquired less than eighty percent of Hartford's stock, the transaction would have been fully taxable, even if ITT had met the solely for voting stock requirement. Even though the continuity of interest would have been complete, with all Hartford shareholders retaining at least an indirect interest in Hartford, the modification of the corporate structure would have been insufficient to allow tax deferred treat-

ment. Judge Augustus Hand examined a similar situation in *Heberlein Patent Corp. v. United States*, 105 F.2d 965, 968 (2d Cir. 1939). The case arose under the 1928 Act analogue to what is now clause D, § 368(a)(1)(D) of the Internal Revenue Code, 26 U.S.C. § 368(a)(1)(D), which required a transferor of assets to receive stock representing control of the transferee. The transferor obtained less than eighty percent of the transferee's stock, and therefore the exchange was taxable. *See also* note 18 *supra*.

We therefore reject taxpayer's argument that the voting stock requirement necessarily relates to the control requirement. Instead, we deem the stock requirement to have been directed to preserving continuity of interest, whereas the control requirement assures some modification, albeit slight, of corporate form. This divergence of policies served by the respective provisions reestablishes their independence, *see also* S.Rep. No. 558, 73d Cong., 2d Sess. 16–17 (1934), *reprinted in* 1939–2 C.B. 586, 598–99, and undermines taxpayers' attempt to integrate them both into the continuity of interest requirement. Although both requirements are perhaps high for purposes of the policies they serve,[21] we must defer to the congressional decision on each.

### B.

Taxpayers note that in other transactions covered by different clauses of the reorganization provisions, Congress has allowed consideration other than voting stock. Judge Schwartz relied on clause A[22] and, more heavily, on clause C.[23] Although Con-

---

**21.** We note that the eighty percent requirement for control may also be criticized as too high for its purpose, because votes of less than eighty percent of the shares are necessary to accomplish any transaction under state corporation law. *See, e. g.*, ABA–ALI Model Bus. Corp. Act §§ 59(c) (majority vote required to amend articles of incorporation) and ¶ 3.03(4)(b) listing states requiring more than a majority); 73 (majority vote required for merger or consolidation) and ¶ 3.03(4)(b) (listing states requiring more than a majority); 79 (majority vote required to dispose of assets other than in the regular course of business) and ¶ 3.03(4)(d) (listing states requiring more than a majority) (2d ed. 1971).

**22.** Section 368(a)(1)(A) defines "reorganization" as "a statutory merger or consolidation."

**23.** Section 368(a)(1)(C) defines "reorganization" as:

(C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired

gress initially treated assets and stock acquisitions identically, we conclude that significant differences in the nature of the transactions justify the disparate treatment currently provided in 368(a).

### 1.

In a statutory merger or consolidation, the corporations affected must submit the proposal to their shareholders and obtain an extraordinary majority before the transaction can be completed. Although taxpayers are correct that some nonstock consideration can change hands in a merger or consolidation qualifying under clause A, courts have applied the continuity of interest requirement to those transactions to limit the exchange of such consideration. *See Roebling v. Commissioner*, 143 F.2d 810, 812 (3d Cir.), *cert. denied*, 323 U.S. 773, 65 S.Ct. 131, 89 L.Ed. 618 (1944). But the most important difference between the two types of transactions is that a statutory merger or consolidation effects a complete change in corporate structure by its very nature, whereas a stock acquisition will only effect a structural change if the acquiring corporation obtains sufficient stock. Even then the alteration is less radical, because the acquired corporation continues to exist as a subsidiary of the acquiring corporation. Shares in the merging corporation are exchanged, essentially, by operation of law rather than by shareholder choice, as in the stock acquisition. All these aspects of mergers or consolidations—substantial corporate formalities, judicial application of a limited continuity of interest requirement, radical change in corporate structure, and automatic conversion of shares—distinguish them from stock acquisitions, and could be

a basis for congressional allowance of nonstock consideration in those transactions.

### 2.

Taxpayers, and the district court, rely more heavily on the analogy to clause C. We once again note significant differences between the two transactions and conclude that Congress could have consciously drawn legitimate distinctions. To effect an acquisition of assets under state corporate law, either by explicit requirement or as a matter of practical necessity, the acquiring corporation must make some provision for the creditors of the transferor corporation. *See* U.C.C. §§ 6–105, 6–106. Although the assets on which those creditors have based their extensions of credit are removed to a different business context, the transferee corporation is usually not liable, absent its agreement, for the debts of the transferor corporation. *See, e. g., United States v. City of Palm Beach Gardens*, 466 F.Supp. 1155, 1163 (S.D.Fla.1979); *see also Kemos, Inc. v. Bader*, 545 F.2d 913, 915 (5th Cir. 1977) (cash purchase); *Drug, Inc. v. Hunt*, 5 W.W.Harr. 339, 35 Del. 339, 358–62, 168 A. 87, 94–95 (1933) (stock for assets; acknowledging the principle but holding that transferee had agreed to assume liabilities, producing a *de facto* merger); *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 456–57, 341 A.2d 174, 176–77 (1975). Nevertheless, secured creditors may have a contractual veto over the transaction by refusing to allow the transfer of their collateral; unsecured creditors must also be considered. *See* U.C.C. § 6–106. Recognizing that the inability to provide for creditors of the transferor corporation under clause C would emasculate the usefulness of that provision, Congress

---

is subject to a liability, shall be disregarded . . . .

Also applicable to clause C is § 368(a)(2)(B):

(B) Additional consideration in certain paragraph (1)(C) cases.—If—

(i) one corporation acquires substantially all of the properties of another corporation,

(ii) the acquisition would qualify under paragraph (1)(C) but for the fact that the acquiring corporation exchanges money or other property in addition to voting stock, and

(iii) the acquiring corporation acquires, solely for voting stock described in para-

graph (1)(C), property of the other corporation having a fair market value which is at least 80 percent of the fair market value of all of the property of the other corporation,

then such acquisition shall (subject to subparagraph (A) of this paragraph) be treated as qualifying under paragraph (1)(C). Solely for the purpose of determining whether clause (iii) of the preceding sentence applies, the amount of any liability assumed by the acquiring corporation, and the amount of any liability to which any property acquired by the acquiring corporation is subject, shall be treated as money paid for the property.

amended the provision in 1939 to allow the acquiring corporation to assume the transferor corporation's liabilities. This amendment was a response to *United States v. Hendler*, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018 (1938), which held that assumption of the transferor's liabilities violated the solely for voting stock requirement. The House Report said:

> The recent Supreme Court case of *United States v. Hendler*, (303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018 (1938)) has been broadly interpreted to require that, if a taxpayer's liabilities are assumed by another party in what is otherwise a tax-free reorganization, gain is recognized to the extent of the assumption. In typical transactions changing the form or entity of a business it is not customary to liquidate the liabilities of the business and such liabilities are almost invariably assumed by the corporation which continues the business. Your committee therefore believes that such a broad interpretation as is indicated above will largely nullify the provisions of existing law which postpone the recognition of gain in such cases.

H.R.Rep. No. 855, 76th Cong., 1st Sess. 19 (1939), *reprinted in* 1939–2 C.B. 504, 518–19. In contrast, a stock acquisition does not, by itself, affect the assets of the acquired corporation; it merely changes the distribution of equity interests in the target corporation, which becomes a subsidiary of the acquiring corporation.

The provision allowing cash or other property in a clause C transaction was added in 1954. Internal Revenue Code of 1954, Pub.L. No. 83–591, 68A Stat. 1, 120–21, § 368(a)(2)(C). Contrary to what taxpayers argue, this provision, § 368(a)(2)(B), does not allow substantially more flexibility in clause C transactions than in clause B transactions. If cash or other property is given, the liabilities assumed by the acquiring corporation must be included in the total twenty percent allowable nonstock consideration, whereas the assumption of liabilities need not be counted against the solely for voting stock requirement if no nonstock consideration is exchanged. Thus, since provision must be made for creditors, and since rarely will the transferor corporation have less than twenty percent of its asset value encumbered by liabilities,[24] the apparent permissibility of cash or other property under clause C is almost inevitably illusory. We believe Congress was fully aware of, and probably intended, this limitation on nonstock consideration under clause C. *See* S.Rep. No. 1622, 83d Cong., 2d Sess. 274–75, *reprinted in* [195;] U.S. Code Cong. & Admin.News 4621, 4914.

The negative relationship of liabilities assumed to cash or other property in an assets acquisition strongly indicates that the allowance of cash or other property under clause C was also intended to allow accommodation of creditors, just as was the provision for assumption of liabilities. But because provision for creditors is of minimal concern in a stock acquisition, this rationale has no relevance to clause B.

We conclude, therefore, that disallowance of nonstock consideration under clause B is not offensive to the statutory schema. Indeed, in view of the substantive distinctions among the various transactions covered in § 368, disallowance of nonstock consideration under clause B is perfectly justifiable, if not clearly desirable. We thus reject the analysis of the district court, which reasoned that allowing cash in a clause B reorganization would promote a "well-ordered universe" under § 368.

## VIII.

Taxpayers have failed to convince us that the interpretation of clause B that has prevailed for almost fifty years is inconsistent with the legislative intent or with sound

---

**24.** Data collected by the Federal Trade Commission and reported in aggregate form by industry group indicate that the percentage of total liabilities to total assets exceeds twenty percent, and generally is close to forty percent, for every industry group. FTC, Quarterly Financial Report for Manufacturing, Mining, and Trade Corporations 22–81 (3d Qtr. 1978) (table presentation). Although some individual corporations within the groups could have a lower ratio, the data demonstrate that corporations generally have too much debt, relative to assets, for the cash allowance in clause C to be used with any frequency.

policy. Rather, our survey of the relevant materials indicates that the settled interpretation best effectuates legislative intent and tax policy. We therefore reverse both lower courts.

The other argument presented by taxpayers as an alternative basis for affirmance is that the cash purchases by ITT in 1969 were not part of the "plan of reorganization" through which the exchange offer was made in 1970. Neither court below considered this argument. Because these cases come before us on appeals from entry of summary judgment, which requires a determination that there are no genuine issues of material fact, *see* Fed.R.Civ.P. 56(c), we deem it unwise for an appellate court to address this issue until it has been considered by the courts below. We therefore remand this issue for consideration in the first instance by the trial courts.

Accordingly, the decision of the Tax Court appealed at No. 79–1985 and the judgment of the district court appealed at No. 79–2192 will be reversed and the causes remanded for further proceedings consistent with the foregoing.